**HOLDEN FUEL OIL COMPANY,**
Appellee,

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellant.**

No. 72–2031.

United States Court of Appeals,
Sixth Circuit.

Argued April 10, 1973.

Decided June 22, 1973.

Richard S. Halberstein, Dept. of Justice, Washington, D. C., for respondent-appellant; Scott P. Crampton, Asst. Atty. Gen., Tax Div., Dept. of Justice, Washington, D. C., Lee H. Henkel, Jr., Chief Counsel, I. R. S., Washington, D. C., of counsel; Meyer Rothwacks and Bennet N. Hollander, Attys., Tax Div., Dept. of Justice, Washington, D. C., on brief.

Murray P. Greenblatt, Southfield, Mich., for petitioner-appellee.

Before PECK, McCREE and MILLER, Circuit Judges.

PER CURIAM.

The appellee taxpayer is engaged in the retail sale of fuel oil in the Detroit, Michigan, area. Prior to 1959, the Gulf Oil Corporation supplied oil to the appellee, as well as to other local dealers, and also delivered oil to its own retail customers. When Gulf decided to get out of the retail market, it negotiated a contract with the appellee to sell its customer lists. The first of two contracts was signed on February 18, 1959, and provided that the total purchase price of the list of Gulf customers located within the appellee's geographical service territory was to be equal to three cents per gallon actually delivered by the appellee to these former Gulf customers during the period June 1, 1961, through May 31, 1962, payable in 36 equal monthly installments beginning July 15, 1962. Credit was to be given for payments on account required by the contract to be made during the first three years of delivery (June 1, 1959, through May 31, 1962), at the rate of one-half cent per gallon so delivered.

On June 13, 1961, the appellee entered into another agreement with Gulf to purchase an additional customer list. This contract, with terms similar to the earlier one, provided that taxpayer would pay Gulf three cents per gallon actually delivered to these customers during the first year of delivery under this contract, June 1, 1961, through May 31, 1962, in 72 equal monthly installments commencing June 15, 1962. Payments on account totaling one-half cent per gallon delivered during that same period were to be made on or before June 15, 1962, 1963 and 1964.

Pursuant to the 1959 contract the appellee paid Gulf $22,665.38 and $15,930.23 during its fiscal years ending May 31, 1960 and 1961. In its fiscal year ending May 31, 1962, appellee, pursuant to the 1959 contract, paid a total purchase price of $93,530.40. The bal-

ance of that amount still due, $77,600.17, was deducted as an expense on the appellee's 1962 tax return.

During the fiscal year ending May 31, 1962, appellee computed the total contract price for oil delivered to customers obtained from the second list as $7,909.38. This amount was deducted that year as an expense on the appellee's 1962 tax return, making the total 1962 expense deductions for the two lists equal to $85,509.55.

The Commissioner disallowed all the expense deductions claimed with regard to the purchase of both customer lists. The appellee filed a petition in the Tax Court for a redetermination of these deficiencies. Appellee then claimed deductions on its tax returns for fiscal 1964, 1965 and 1966 related to the purchase of the customer lists for "selling expense-amortization" based upon the number of customers lost each year. The Commissioner mailed a second notice of deficiency to the appellee for its fiscal years ending May 31 of 1963 through 1966, which disallowed these claimed amortization deductions. Appellee filed a petition in the Tax Court for a redetermination of these deficiencies; the two actions were consolidated in the Tax Court.

The Tax Court held that the customer lists were capital assets, and that their costs were not fully deductible in the years incurred as business expenses as claimed initially by the appellee. The Court also held that 75% of the cost of the lists was amortizable over a 15 year period commencing June 1, 1959, with 75% of the payments actually made in each of the first three years deductible for those years, and 75% of the balance deductible over the remaining twelve years. The Commissioner has perfected his appeal from that judgment.

■ ■ The cost of an intangible asset may be annually depreciated or amortized for tax purposes if it can be established that the asset is of use in a business for only a limited period of time which can be estimated with reasonable accuracy. Int.Rev.Code of 1954,

§ 167(a); Blaine v. United States, 441 F.2d 917, 919 (5th Cir. 1971), cert. denied, 404 U.S. 952, 92 S.Ct. 286, 30 L. Ed.2d 269 (1972). However, if the intangible asset involved is goodwill, or is in the nature of goodwill, no depreciation or amortization deductions are permissible because such asset is either not wasting or has no reasonably ascertainable useful life. Treas.Reg. § 1.167 (a)–3.

■ The appellant's first contention is that the lists are not amortizable because they are intangible assets in the nature of goodwill, and have no reasonably ascertainable useful lives. The appellant argues that the purchaser obtains not only a list of names, but also obtains an established clientele and an on-going business relationship, the value of which fluctuates as customers are dropped or acquired, and that therefore the lists have a business usefulness of a limited time which is not reasonably ascertainable.

We disagree. The appellee's only guaranteed acquisition from this contractual arrangement was the list of names. Although Gulf did send a form letter to all of the customers on the list informing them that the appellee was now distributing Gulf oil in the area and solicited their business, these customers were not obligated to purchase fuel oil from the appellee because there had been no contract between Gulf and its customers. The list contained over 5,000 potential customers, but only 3,007 accounts were sold fuel oil by the appellee during the fiscal year ended May 31, 1962. On May 31, 1968, only 1,577 customers were still purchasing oil from the appellee.

Since the appellee initially acquired a list of 5,199 names, and was supplying only 1,577 of them with oil as of May 31, 1968, the lists were demonstrably wasting assets. Furthermore, evidence was introduced to show that the appellee would lose approximately 10% of its customers each year. Trade indicators calculated the life of a fuel oil account to be from 8 to 10 years. Furthermore,

the parties stipulated that the appellee lost approximately 50% of its total fuel oil deliveries initially acquired from the list in a six year period following May 31, 1962, the year that the contract price was determined. Upon this evidence, the Tax Court determined that the list acquired by the appellee had a limited life and that life was reasonably ascertainable. This was in accordance with the regulations which provide that an intangible asset may be the subject of a depreciation allowance if it is known from experience or other factors to be of use in the business for only a limited period, the length of which can be estimated with reasonable accuracy. Treas.Reg. § 1.167(a)–3.

■ Although the record contains little if any support for the 15 year life period determined by the Tax Court, the appellant has stated that should this Court conclude that the cost of the lists was amortizable, he would not dispute the 15 year life. Finally, the appellant contends that the method of amortization allowed by the Tax Court is improper because it was based upon the method applied in Associated Patentees, 4 T.C. 979 (1945), which the appellant contends is not applicable to the present case because the annual percentage payments in the present case were not based upon a percentage of income derived from the lists over their entire alleged useful lives, and because the price, while based upon the volume of business generated during one fiscal year, was in no way dependent upon the income generated by the lists in later years.

We disagree, and affirm for the reasons stated by the Tax Court:

However the contract which initiated the sale of the list was effective as of June 1, 1959. Petitioner [appellee] serviced customers acquired from the list during that 3-year period. It is therefore manifest that the list had a value during this initial 3-year period prior to the determination of the total sales price. Amortization of the cost of the list over a 15-year period beginning as of June 1, 1959, is however inappropriate as the cost was uncertain in those initial 3 years.

Faced with this unusual situation we adopt the method of amortization applied in Associated Patentees, Inc., 4 T.C. 979 (1945). In *Associated*, the taxpayer purchased a patent. The total cost was indeterminable as the buyer was to pay a percentage of the income produced from the rental of the patent for a fixed number of years. This Court, so as to clearly reflect income, permitted the taxpayer to deduct as depreciation the amount paid in each year toward the cost of the patent. Applying that theory to the instant case, petitioner may deduct as an amortization deduction 75 percent of the amount paid to Gulf during the fiscal years ended May 31, 1960, 1961 and 1962. For the fiscal year ended May 31, 1963 and thereafter, the total contract price having been determined, petitioner must return to the traditional method of depreciation, amortizing 75 percent of the remaining unpaid cost of the list over its 12-year remaining life.

The judgment of the Tax Court is affirmed.