446

RICHARD S. MILLER & SONS, INC.,
et al.

v.

The UNITED STATES.

No. 653–71.

United States Court of Claims.

June 16, 1976.

John A. Burgess, South Bend, Ind., attorney of record, for plaintiffs. John L. Carey and Thornburg, McGill, Deahl, Harman, Carey & Murray, South Bend, Ind., of counsel.

Allan C. Lewis, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D. C., for defendant. Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before NICHOLS, KUNZIG and BENNETT, Judges.

### OPINION

PER CURIAM:

This case comes before the court on defendant's exceptions to the recommended decision of Trial Judge Kenneth R. Harkins, filed October 22, 1975, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as hereinafter set forth, it hereby affirms and adopts the same as the basis for its judgment in this case. It is, therefore, concluded that plaintiffs are entitled to an allowance for depreciation of the intangible asset represented by the insurance expirations purchased from the Arch Insurance Agency in 1966, and that this intangible asset has a useful life of not more than 10 years and a value of $47,644.35. Plaintiffs have overpaid their Federal income taxes for the years 1966, 1967, 1968, and 1969 and are entitled to refunds of this overpayment, plus interest, as allowed by law. This case is remanded to the Trial Division for further proceedings pursuant to Rule 131(c).

### OPINION OF TRIAL JUDGE

HARKINS, Trial Judge:

In this tax case, plaintiff taxpayers, shareholders of Richard S. Miller & Sons, Inc. (Miller & Sons),[1] seek refunds amounting to $8,782.75 from Federal income taxes paid in the 4-year period 1966–69. Returns for the years 1966 through 1969 were timely filed. Claims for refunds sought a depreciation allowance under the Internal Revenue Code,[2] measured by a claimed 5-year useful life, for the value of an intangible asset that consisted of insurance expirations and related papers acquired by purchase. Plaintiffs' refund claims were denied. This action has been properly and timely commenced, and the court has jurisdiction of the subject matter and of the parties. Trial was held at South Bend, Indiana, on May 28–29, 1974.

Effective May 1, 1966, Miller & Sons purchased the insurance business and agency, together with the goodwill and all current insurance records and papers, from the Arch Insurance Agency.[3] The records involved were concerned only with fire and casualty insurance. Both agencies were small enterprises that also engaged in relat-

---

1. Plaintiffs include the corporation, each of its shareholders, and two nonshareholding spouses who filed joint returns with their husbands. Miller & Sons is an electing small business association under sections 1371–79 of the Internal Revenue Code of 1954, as amended. Miller & Sons has paid no Federal income taxes and only the natural plaintiffs seek relief.

2. 26 U.S.C. § 167(a) (1970).

3. At the time of the sale, the Arch Insurance Agency was owned and operated by Mrs. Loren Teghtmeyer, the widow of Dewey Arch, who had founded the agency in the early 1930's and who had operated it until his death in 1955.

ed activities such as real estate sales, income tax preparation, and licensing and collection services. Both were located in Bremen, Indiana, a rural community with a population in 1966 of approximately 2,700 persons and a trading population in a 15-mile radius of approximately 6,000.

The sales contract transferred to Miller & Sons the Arch business and agency, its goodwill, its insurance records and papers, which consisted primarily of 1,383 expirations or dailies, and the right to use the Arch name. Over the 60-month life of the contract, Miller & Sons paid $15,000 for a covenant not to compete, $4,694.51 for interest, and $61,174.92 for the balance of the assets. An expiration (or daily) is a copy of the face of an insurance policy made when the policy is issued. It shows the name of the insured, address, type of insurance, premium, carrier, property covered, and expiration date. Its principal value in the insurance business is its indication of the most advantageous time to solicit a renewal.

◼ At issue is whether plaintiffs' evidence is sufficient to show that the indivisible asset represented by the 1,383 insurance expirations, as a factual matter, is separate from other elements of goodwill that concurrently were acquired by Miller & Sons as part of a going concern. For the reasons set forth below, plaintiffs have carried their burden and are entitled to depreciation deductions for this intangible asset. The 1,383 insurance expirations constitute a wasting mass asset that has a limited useful life, the duration of which can be ascertained with reasonable accuracy, and has a determinable value separate and distinct from goodwill.

## I.

◼ Section 167(a) of the Internal Revenue Code authorizes as a depreciation deduction a reasonable allowance for the exhaustion and wear and tear of property used in a trade or business. An intangible asset, such as insurance expirations, may be subject to a depreciation allowance, under the Treasury regulations, if it is "known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy."[4]

◼ Whether a particular intangible capital asset may be depreciated, when it is acquired by purchase of an ongoing operation, depends upon its identification with goodwill. Where the useful life of an intangible readily can be shown to be limited, such as with a patent or a copyright, depreciation is available without question[5] even though for some purposes it is an element of goodwill.

◼ Goodwill is a concept that embraces many intangible elements and is presumed to have a useful life of indefinite duration. Collectively, these intangibles are associated with continuing favorable customer patronage and goodwill is seen as a self-regenerating asset whose economic value fluctuates but does not necessarily diminish. Since by definition goodwill has no ascertainable useful life, the presumption that this intangible is a nondepreciable capital asset is conclusive.[6] The Treasury regulation specifically provides "[n]o deduction for depreciation is allowable with respect to goodwill."[7]

◼ The term "goodwill" has a varying content, depending on its usage. Goodwill sometimes is used to describe the aggregate of all of the intangibles of a business, including such items as patents, trademarks, leases, contracts, and franchises. Since a normal rate of return usually is calculated

---

**4.** 26 C.F.R. § 1.167(a)–3. The allowance is sometimes referred to as an "amortization" allowance when intangibles are involved. For uniformity, "depreciation" is used herein.

**5.** *Ibid.*

**6.** *Miami Valley Broadcasting Corp. v. United States,* 499 F.2d 677, 681, 204 Ct.Cl. 582, 591 (1974); *Houston Chronicle Publishing Co. v. United States,* 481 F.2d 1240, 1247 (5th Cir. 1973).

**7.** 26 C.F.R. § 1.167(a)–3.

on tangible assets only, goodwill has been used as a synonym for the return on all the intangibles of a business.[8] In a more restricted sense, goodwill is the expectancy that the old customers will resort to the old place.[9] It is the sum total of all the imponderable qualities that attract customers and bring patronage to the business without contractual compulsion.[10] Another definition equates goodwill with a rate of return on investment which is above normal returns in the industry and limits it to the residual intangible asset that generates earnings in excess of a normal return on all other tangible and intangible assets.[11] In this court, for tax purposes, the intangible value of a business is divisible into its identifiable constituent elements.[12]

Both the Internal Revenue Service and many courts in cases that have considered depreciation allowances for insurance expirations have tended to identify such intangibles with goodwill, either by viewing the expiration list as goodwill itself or by finding it so related to goodwill that it was inextricable therefrom. Revenue rulings in 1965 equated the price of insurance expirations with the price paid for goodwill and indicated as a matter of law that such could not be recovered by a purchaser through depreciation or amortization. Insurance expirations were treated as intangibles in the nature of goodwill that provided a customer structure that lasts an indefinite time in the future.[13]

The Tax Court, in a case that involved the transfer of an ongoing insurance agency and its goodwill, stated that any definition of goodwill would include "the concept of the advantage that the proprietor of an existing business enjoys resulting from the probabilities that old customers will continue their patronage" and that it is "difficult to see how any insurance agency could transfer its goodwill without delivering its insurance expiration list to the transferee." The list of expirations was considered an integral part of the goodwill of a going insurance agency business.[14]

In most sales, the insurance expirations are valuable only collectively and they are considered to be a single intangible asset rather than a collection of individual policies. Under the "mass asset" rule, the value of the whole does not diminish by the loss of a component, a loss deduction is not appropriate for the loss of a component, and the single entity, unlike the components, has been considered in many cases to have no determinate useful life.[15] The rationale and purpose of the mass asset rule "is to prevent taxpayers from increasing the value of depreciable property to offset the amount paid in excess of book value of assets purchased. This doctrine makes it possible to strike down depreciation deductions for amounts which should properly be allocated to good will."[16] As applied in cases dealing with depreciation for insurance expirations, the mass asset rule did not allow the acquisition cost to be depreciated because the expirations were so "inextricably" linked with goodwill that they could

---

**8.** *Meredith Broadcasting Co. v. United States,* 405 F.2d 1214, 1224, 186 Ct.Cl. 1, 19, and cases there cited (1968).

**9.** *Winn-Dixie Montgomery, Inc. v. United States,* 444 F.2d 677, 681 (5th Cir. 1971).

**10.** *Houston Chronicle Publishing Co. v. United States, supra* note 6, 481 F.2d at 1248 n. 5.

**11.** Note, *Amortization of Intangibles: An Examination of the Tax Treatment of Purchased Goodwill,* 81 Harv.L.Rev. 859, 861 (1967–68).

**12.** *KFOX, Inc. v. United States,* 510 F.2d 1365, 1376, 206 Ct.Cl. 143, 164–65 (1975); *Meredith Broadcasting Co. v. United States, supra* note 8, 405 F.2d at 1224, 186 Ct.Cl. at 18.

**13.** Rev.Rul. 65–175 and 65–180, 65–2 Cum.Bull. 41 and 279.

**14.** *Thoms v. Commissioner,* 50 T.C. 247, 256 (1968); *see also Tomlinson v. Commissioner,* 58 T.C. 570, 581–82 (1972), *aff'd,* 507 F.2d 723 (1974).

**15.** *Winn-Dixie Montgomery, Inc. v. United States, supra* note 9, 444 F.2d at 686; *Golden State Towel & Linen Serv. v. United States,* 373 F.2d 938, 941, 179 Ct.Cl. 300, 305 (1967).

**16.** *Commissioner v. Seaboard Finance Co.,* 367 F.2d 646, 652 (9th Cir. 1966).

not be considered as having a separate existence.[17] As noted by the dissent in *Marsh & McLennan,* however, the mass asset rule does not prevent a depreciation deduction in a case where the expirations as a single asset can be valued separately and the requisite showing made that the useful life of the information contained in the intangible asset as a whole is of limited duration.[18]

■ Identification of insurance expirations with goodwill, as a matter of law, either through equating with goodwill or through application of the "mass asset" concept, has been clarified. Entitlement to a depreciation allowance is a question of fact and not of law.[19]

■ There is no per se rule of nondepreciability or nonamortizability in every case that involves both goodwill and other intangible assets. The depreciability of assets such as customer and subscription lists, location contracts, insurance expirations, etc., is a factual question only.[20] The taxpayer has a heavy burden to establish a right to an allowance for depreciation for insurance expirations. The evidence must establish that the expirations (1) have an ascertainable value separate and distinct from goodwill and (2) have a limited useful life, the duration of which can be ascertained with reasonable accuracy. In application of this test, precise exactitude is not required. As the court in *Houston Chronicle* states:

> Our view—that amortizability for tax purposes must turn on factual bases—is more in accord with the realities of modern business technology in a day when lists are bartered and sold as discrete vendible assets. Extreme exactitude in

ascertaining the duration of an asset is a paradigm that the law does not demand. All that the law and regulations require is reasonable accuracy in forecasting the asset's useful life. [481 F.2d at 1253–54.]

## II.

■ The taxpayer bears all burdens in regard to establishing a right to claim a depreciation allowance for insurance expirations under section 167(a).[21] In this case, this burden is particularly difficult because Arch goodwill in fact was transferred at the same time as the expirations. Cases that have recognized a depreciation deduction for insurance expirations generally have found no goodwill to be present in the sale, *i. e.,* where the seller had "run-down" the agency, ruined its reputation, and no goodwill was left;[22] where the seller had gone out of the fire and casualty business but remained in other insurance business and did not sell goodwill;[23] or where the seller's insurance business was primarily walk-in trade acquired as an incidental sideline to other activities.[24]

### Goodwill

■ At the threshold, plaintiffs must show that the 1,383 Arch insurance expirations are separate and distinct from the goodwill that was transferred in the sale. The most significant indication that an intangible asset is separate and distinct from goodwill is whether its useful life can be shown with reasonable accuracy to be of limited duration. The most important criterion is whether in fact it is a wasting asset.[25]

17. *Marsh & McLennan, Inc. v. Commissioner,* 420 F.2d 667, 668 (3d Cir. 1969).

18. *Id.* at 672–73 n. 3.

19. *Houston Chronicle Publishing Co. v. United States, supra* note 6, 481 F.2d at 1249.

20. Rev.Rul. 74–456, 74–2 Cum.Bull. 65.

21. *KFOX, Inc. v. United States, supra* note 12, 510 F.2d at 1369, 206 Ct.Cl. at 151–52; *Houston Chronicle Publishing Co. v. United States, supra* note 6, 481 F.2d at 1245.

22. *Savings Assurance Agency, Inc.,* 22 T.C. Mem. 200 (1963).

23. *Weaver v. United States,* 65–1 USTC § 9410 (W.D.Okla.).

24. *Vaaler Ins., Inc. v. United States,* 68–1 USTC § 9183 (N.Dak.). *But see Stewart v. United States,* 65–2 USTC § 9607 (N.D.Okla.).

25. Detailed findings of fact on which the award to plaintiffs is based are filed herewith. Facts necessary for perspective and which control the decision are set forth in this opinion.

Plaintiffs contend, because the Arch Insurance Agency was a dying organization, goodwill in the sale was of minimal value or was nonexistent. It is clear that this was the sale of a going concern that had demonstrated a pattern of growth. In addition to the expirations, Miller & Sons acquired from Arch intangible factors for access to former Arch clients that warranted protection through a covenant not to compete that was separately bargained for and compensated. The value of these separate goodwill factors was a substantial part of the entire transaction.

The extent and nature of the goodwill transferred are delineated by the business context of the transaction. Both Miller & Sons and Arch, with annual gross commissions in the $28,000 to $34,000 range, were small business enterprises in Bremen, Indiana. Each, in addition to the fire and casualty insurance agency business, provided additional related services. These additional services included real estate sales, income tax preparation, running a license bureau, and a gas collection service. Bremen, Indiana, is a rural community with a population of 2,700 persons at the time of the sale and a trading population, within a 15-mile radius accessible to both agencies, of approximately 6,000 persons. Richard Miller, the founder and principal solicitor of Miller & Sons, knew by sight approximately 85 percent of the population of Bremen, and the principal method of selling insurance in the marketing area was through face-to-face contacts.

The Arch Insurance Agency had been active in Bremen since the early 1930's and had competed with Miller & Sons after that agency was founded in 1961. At the time of the sale, Bremen, Indiana, and the surrounding marketing area were served, in addition to Arch and Miller & Sons, by a State Farm Insurance Company agent and a part-time Allstate Insurance Company agent. Shortly after the sale, another independent agent became operative in the marketing area.

Fire and casualty insurance is more competitive than other types of insurance, and is characterized by the tendency of policyholders to change insurance companies more frequently than is the experience in life, health and accident, or medical insurance. For this reason, expirations in the fire and casualty insurance business, with their information on the most propitious time to solicit renewals, are particularly valuable assets that are bought and sold.

In the sale to Miller & Sons, goodwill specifically was transferred by the contract. Intangible assets acquired through the contract, in addition to goodwill, were a covenant not to compete for 5 years, the right to use the Arch name, and the information on the insurance expirations and related records.

The most significant indication that goodwill was transferred in the sale was the fact, with full knowledge of competition in the marketing area, Miller & Sons agreed to pay $15,000 to assure that neither Mrs. Teghtmeyer nor Charles Arch would do business in fire and casualty insurance in the marketing area for a 5-year period. A covenant not to compete, in a business where personal skill and individual reputation are major factors in the client relationship, is the primary protection for the buyer to assure that the ongoing business in fact is acquired.

Payments under the contract were to be 22.5 percent of the buyer's gross commissions for 60 months, with allocations earmarked for interest and for the covenant not to compete. This method of payment is typical of the sale of an ongoing business and accompanying goodwill.

A general insurance agency is a personal service business and the attachment of a client to a particular agent is important. Superiority of service from personal skill and efforts provides a competitive advantage which is difficult to transfer in a sale. Notwithstanding the fact that the goodwill of a personal service business, in large part, is dependent upon the individual relationships and qualifications of the seller, the acquisition of a going concern does provide to the buyer several advantages which are essential elements of goodwill and which

are separable from the expirations and related records. Through the purchase, Miller & Sons acquired the right to represent itself in the community as the successor to the Arch Insurance Agency's business. Both Miller & Sons and Mrs. Teghtmeyer notified former Arch clients of the sale and encouraged continued business with Miller & Sons. Although Miller & Sons did not need such introduction to identify the Arch clientele, or to gain an entree into the marketing area, these communications were valuable and were sought by Miller & Sons to encourage renewals from former Arch clients.

Although goodwill was a substantial element in the sale, the transfer of an ongoing business was not the primary objective sought by Miller & Sons. The transfer of goodwill, during the negotiations, was not bargained for specifically. After the sale, Miller & Sons did not use the Arch name, its location, its sales personnel, or office procedures. The sales contract did not include office equipment, furniture, motor vehicles, or chattel personal property, nor did it include intangibles such as cash, notes, accounts receivable, or uncollected premiums. The use of the seller's name in the single letter that each party sent to Arch clients, in the circumstances, is not sufficient to show that a major consideration was an attempt to trade on the name of Arch.

*Limited Useful Life*

In the Bremen marketing area, Miller & Sons did not need to purchase the Arch expirations in order to gain an entree into the market, nor did it need the expirations to identify Arch clients. Acquisition of the body of information that was contained in the expirations permitted Miller & Sons to incorporate in its files information that otherwise could have been acquired by internal growth. The purchase of the expirations was a substitute for time and effort to develop and place on the books a comparable number of policies for the first time. In the realities of modern business technology, the expirations represented an intangible asset with an existence separate from other elements of goodwill.

An intangible asset is separate and distinct from goodwill when its useful life can be shown with reasonable accuracy to be of limited duration. The 1,383 insurance expirations and related records purchased by Miller & Sons constituted a single, indivisible asset. The useful life of this mass asset is determined from facts relative to the whole, and not from experience with any particular policy or account involved. Of the expirations purchased, 60 percent involved policies that expired 1 year from the date of sale and the remaining 40 percent expired 3 years from the date of sale. Accordingly, all of the information contained in the expirations would have been used for the first time by Miller & Sons, and either continued as renewals or abandoned because of nonrenewal, by the end of 3 years.

The information in the expirations was incorporated into Miller & Sons' record-keeping routines. Three identical labels were made for each, with the name of the insured, address, type of insurance, premium, insurance carrier, billing date, and expiration date. One label identified the envelope, filed alphabetically, that contained the expiration. The second label was filed alphabetically in a 3-inch x 5-inch card index. The third label was filed alphabetically by month of expiration. Prior to each respective expiration date, this information was used to solicit a renewal. If the policy was not renewed, no further use was made of the expiration by Miller & Sons.

Miller & Sons' nonrenewal experience, in both accounts and policies, in the 1,383 expirations was at a higher rate in the years immediately following the sale than it was in later years. Of the 844 accounts in the expirations, 122 were not renewed in the remaining 8 months of the first year, 161 additional were not renewed in the second year, so that by the end of 1967, 283 accounts or 33.53 percent had been lost. By the end of the first 5 years, an additional 144 accounts were not renewed. At that time, 427 accounts or 50.59 percent had

been lost, and less than one-half remained active.

In the 24 months following the sale, the average annual nonrenewal rate for policies was 19.7 percent, with 545 (39.41 percent) of the 1,383 policies not renewed. In the 5-year period measured by 60 months from May 1, 1966, the average nonrenewal rate was 11.2 percent. At the end of 5 years, from the 1,383 expirations, 773 policies were no longer being written by Miller & Sons and 427 of the 844 accounts no longer were using Miller & Sons for their insurance needs. The package of expirations demonstrably was a wasting asset.[26]

The Arch expirations purchased by Miller & Sons would have been exhausted in 5.08 years at the May 1966–April 1968 nonrenewal rate and would have been exhausted in 8.92 years at the May 1966–April 1971 nonrenewal rate. By the end of April 1971, 60 months had elapsed from the date of sale. At that time, Miller & Sons' obligations to make further payments under the contract ceased, and the covenant not to compete expired. The term of the covenant measures the period that the parties believed the goodwill acquired from Arch needed to be protected. After the 5 years, the goodwill acquired by Miller & Sons from Arch no longer is identifiable in Miller & Sons' operations. Renewals thereafter are the product of the personal efforts, related services, and reputation of Miller & Sons. After the 5-year period, the information in the Arch expirations was amalgamated in Miller & Sons' records and procedures, and Miller & Sons' renewal experience would apply to the remaining policies and accounts acquired from Arch.

In the period January 1970 through April 1974, the average annual nonrenewal rate for all policies of Miller & Sons was 10 percent.

The Treasury regulations permit depreciation of an intangible asset when the knowledge of its limited useful life can be shown "from experience or other factors."[27] "Useful life" for depreciation purposes is an estimate, and the length of the useful period must be shown by evidence that allows it to "be estimated with reasonable accuracy." The law does not demand "[e]xtreme exactitude in ascertaining the duration of an asset."[28] The appropriate test is whether the particular taxpayer adequately has demonstrated that, in his business, the useful life of the challenged intangible reasonably may be approximated.[29]

That the useful life of the collective information contained in the 1,383 expirations has limits is not impaired by the fact that, after the end of the 5-year period, 417 former Arch accounts continued to do business with Miller & Sons, and 581 policies had been renewed. In *Marsh & McLennan,* the court found that as long as a customer renews "the customer relationship is still derivative of the initial situation" as successor to the seller.[30] In that case, however, the court disallowed depreciation for costs of acquiring the expiration lists because it found (1) the expirations were inextricably linked with goodwill as a matter of law and on the facts before it and (2) that the statistical evidence, on which the estimate of the useful life of the accounts involved was based, was insufficient because it was based on the buyer's experience in a period prior to the sale and not based on the buyer's experience with the accounts sold. Here, the estimate of the length of the useful life of the Arch expirations is based upon Miller & Sons' experience with the former Arch clients during a 5-year period and thereafter based upon Miller & Sons' loss experience on all of its policies.

**26.** *Holden Fuel Co. v. Commissioner,* 479 F.2d 613, 615 (6th Cir. 1973).

**27.** 26 C.F.R. § 1.167(a)–3.

**28.** *Houston Chronicle Publishing Co. v. United States, supra* note 6, 481 F.2d at 1253–54.

**29.** *Burnet v. Niagara Falls Brewing Co.,* 282 U.S. 648, 654–55, 51 S.Ct. 262, 75 L.Ed. 594 (1931); *Super Food Services, Inc. v. United States,* 416 F.2d 1236, 1240 (7th Cir. 1969).

**30.** *Marsh & McLennan, Inc. v. Commissioner, supra* note 17, 420 F.2d at 670.

Defendant claims that plaintiff cannot establish that the Arch expirations had a limited useful life because Miller & Sons' records do not reflect referrals made by former Arch clients, both those who had renewed or had not renewed their policies. Defendant claims the record is clear that referrals by satisfied customers are a fruitful source of new customers and that referrals occur regularly and frequently.

■ The fact that Miller & Sons did not maintain records on referrals does not preclude the showing that the Arch expirations have a limited useful life. In the Bremen market, as in the case of renewals, referral business after the 5-year period would reflect the personal skill, integrity, and reputation of Miller & Sons, and would not derogate from limitations on the useful life of the Arch expirations. In this market, a referral from a former Arch client has no more significance than a referral from any other person in the area.

■ On the basis of Miller & Sons' renewal experience with the information contained in the 1,383 Arch expirations, together with Miller & Sons' 1970–74 experience on all policies, the useful life of the intangible asset represented by the Arch expirations can be estimated with reasonable accuracy to be not more than 10 years from the date of purchase on May 1, 1966.

*Value*

In addition to showing that the expirations had a limited useful life, plaintiffs also must show that this asset had an ascertainable value separate and distinct from goodwill. No allocation for goodwill was made in the negotiations to purchase the Arch Insurance Agency. An independent value was separately negotiated and established for the covenant not to compete. At the time the sales agreement was executed, the parties had manifested in a timely fashion their intention to allocate a portion of the purchase price to the covenant not to compete.[31] Neither before, during, nor af-

ter the negotiations did Miller & Sons examine each individual name or policy among the acquired expirations, or separately appraise the value of each client or policy. No value was allocated by the parties to the expirations either as a single asset, or as a collection of independently valued parts. Exclusive of the amounts for the covenant not to compete and interest, the price paid by Miller & Sons was for two kinds of intangible assets: (1) goodwill or property in the nature of goodwill and (2) for the information in the 1,383 expirations and accompanying records.

By acquisition of the Arch expirations, Miller & Sons, at one stroke, nearly doubled its volume. The expirations represented policies in being and were a substitute for the generation of an equivalent amount of business by Miller & Sons through internal growth. Individually, an expiration represents the one-time cost and expense of adding a new client and putting a policy on the books for the first time. Initial solicitation costs are a recognized category of standard operating expense; one phase of the normal business of a general insurance agency consists of the development of new business. Costs associated with development of new business normally are higher than costs required to retain or renew policies already on the books.

■ The value of the Arch expirations is measured by the costs Miller & Sons would have incurred to develop an equivalent quantity of new business. This requires information on three factors: (1) the number of new policies written; (2) the total expenses incurred by insurance operations; and (3) the proportion of total insurance operating expenses that are used to develop new business.

With the acquisition of the Arch Insurance Agency in 1966, Miller & Sons' business, as measured by gross commissions, increased from $28,328 in 1965 to $63,399 in 1967, and remained relatively constant at this level until 1970, when new growth commenced. In the period between 1967 and

---

**31.** *General Ins. Agency, Inc. v. Commissioner,* 401 F.2d 324 (4th Cir. 1968); *Robins & Weill,*

*Inc. v. United States,* 382 F.Supp. 1207, 1216 (M.D.N.Car.1974).

1970, Miller & Sons' operations, as reflected by gross commissions and by the testimony of plaintiffs' witnesses, were devoted to assimilation of the Arch business and reorganization and show no significant development of new business. Miller & Sons did not maintain records or information that establish the number of new policies written from 1966 through 1969.

Inasmuch as business in the period 1966–69 was relatively constant, and new growth did not start until after 1970, the period 1970–74 is more representative for purposes of computation of development costs. In the year 1970, Miller & Sons wrote 231 new policies, and 261, 282, and 325 new policies were written in 1971, 1972, and 1973, respectively. A total of 1,099 new policies were written in this period.

▪ The total expense incurred by Miller & Sons in the period 1970–73 in its insurance business amounted to $228,102. Of this amount, the portion devoted to development of new business amounted to 16.6 percent, or a total of $37,865.[32] The weighted average cost to Miller & Sons to develop each new policy in the period 1970–73 was $34.45. It is appropriate to apply this unit cost to the number of policies in the 1,383 expirations acquired in 1966 because the period is representative of Miller & Sons' operations in a period characterized by internal growth rather than growth by acquisition. As so applied, the total cost Miller & Sons would have incurred to develop by internal growth the 1,383 policies acquired from the Arch Insurance Agency would have been $47,644.35 and is the value of this depreciable intangible asset.

---

**32.** Plaintiffs contend that 20 percent of Miller & Sons' time was devoted to development of new business in 1966–69 and that the total insurance expense should be allocated on that basis. In the period 1970–73, however, the only period with relevant new business statistics, only 16.6 percent of Miller & Sons' resources was spent to develop this business.