SOUTHERN BANCORPORATION, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Southern Bancorporation, Inc. v. Commissioner
Docket No. 4254-83.
United States Tax Court
T.C. Memo 1986-601; 1986 Tax Ct. Memo LEXIS 6; 52 T.C.M. (CCH) 1248; T.C.M. (RIA) 86601; December 29, 1986. *6 Held: Premium paid to Federal Deposit Insurance Corporation by bank for certain assets and assumption of certain liabilities of a failed bank is not amortizable under Banc One Corporation v. Commissioner,84 T.C. 476 (1985) and collateral estoppel precludes relitigation of the issue. Robert H. Hishon, for the petitioner. Julian A. Fortuna, for the respondent. WHITAKER
MEMORANDUM FINDINGS OR FACT AND OPINION WHITAKER, Judge: Respondent deterined deficiencies in petitioner's Federal income tax for the years and in *7 the amounts as follows: Year
Amount
1975
$30,824.00
1976
637,523.00
1977
1,001,894.10
1978
282,713.00
The issues for decision are whether petitioner may amortize a premium of $5,560,000 paid by its banking subsidiary to acquire the assets and deposit liabilities of a failed bank from the Federal Deposit Insurance Corporation (FDIC) and whether petitioner is estopped from relitigating the amortization issue in this case. [1]
FINDINGS OF FACT Some of the facts have been stipulated and they are so found. Petitioner is a holding company incorporated under the laws of South Carolina with its principal place of business in Greenville, South Carolina on the date of filing this petition. Southern Bank and Trust Company (Southern) was at all times during the years 1973 *8 through 1978, both inclusive, a wholly owned subsidiary of petitioner. Commencing with the taxable year 1973, and during the years at issue, petitioner and its wholly owned subsidiaries (including Southern) filed consolidated Federal income tax returns pursuant to section 1501. [2]
Facts Applicable to Amortization Issue
As more fully developed below, on September 20, 1974, Southern acquired certain of the assets and assumed certain of the liabilities of American Bank and Trust (ABT), a South Carolina Corporation, from the FDIC. The agreement with the FDIC specified that the book value of the liabilities to be assumed, approximately $133,000,000, would be equal to the book value of the assets to be acquired less the premium agreed to be paid by Southern. Thus, the assets were valued at approximately $127,475,000. During the early part of September 1974, the fact that ABT had been having financial problems became public knowledge. ABT had begun to lose some of its deposits *9 but its liquidity was assured by the FDIC. Thus a serious run on ABT was avoided and its deposit relationship with its depositors was essentially maintained through the Southern acquisition. On September 5, 1974, the FDIC discussed the ABT matter with representatives of Southern and five other banking institutions. On that day, a preliminary proposal for a merger with ABT was submitted by Southern but its terms were unacceptable to the FDIC and merger discussions were abandoned. At the request of the FDIC, Management [3] of Southern and other banking institutions attended a meeting on September 18, 1974, to discuss other possible solutions to the ABT problem. Prior thereto, the potential acquisition of ABT assets had been discussed by Management. At the September 18 meeting, the FDIC provided some information as to the assets and liabilities of ABT that were available for purchase and assumption. On September 19, 1974, the FDIC informed Southern and other potential bidders for the ABT assets that ABT would be closed after normal business hours on Friday, September 20, 1974, by the South Carolina State Board of Bank Control which would then tender receivership of ABT to the FDIC. *10 On September 19, 1974, the FDIC furnished the potential bidders including Southern with a "bid package." Also on that day, Management met to consider and approve the making of a bid proposal for the purchase of ABT assets and the assumption of certain of its liabilities. Southern submitted its bid at 5 p.m. on September 20, 1974. The sum of $5,560,000 was the amount of the "premium" offered to be paid in addition to the book value of the ABT assets less liabilities to be assumed. [4]
*11 At 7:45 p.m. on September 20, 1974, the FDIC announced that Southern was the successful bidder. Over the weekend steps were taken to close the transaction so that on Monday, September 23, 1974, the 29 former ABT banking offices acquired by Southern were opened under Southern's name. None of these branches was in a community where Southern then had a branch. [5] Efforts were made by all parties concerned, including governmental officials of the State of South Carolina, to assure former customers of ABT (whose deposits Southern assumed) of the solvency of Southern and the safety of those deposits so as to avoid a run on these new Southern branches. Included in the liabilities assumed by Southern were $112,215,000 of customer deposits. It also assumed the trust business, the safety deposit box obligations, safekeeping arrangements, and certain other similar banking obligations of ABT. After the closing, Southern returned some of the approximately $41,000,000 in loans so acquired to the FDIC and acquired certain other loans so that Southern eventually acquired a total net face amount of ABT loans in excess of $40,000,000. *12 Management wished to be the successful bidder for the assets and liabilities of ABT, which would provide extra liquidity for it, but it had had no prior experience in negotiating with the FDIC for such an acquisition. Management was aware that a premium would be required to be paid. A premium of 5 percent of deposits was determined to be reasonable. Management understood that in 1973 a San Francisco bank had acquired from the FDIC the assets and assumed the deposit liabilities of another bank. The bid premium included in that bank's package reflected a value placed on the assumed deposit liabilities equal to 5 percent. Five percent of the ABT deposit liabilities was $5,600,000 which fact was taken into account in fixing the bid proposal premium at $5,560,000. However, the bid package contained no allocation of the total purchase price or of the premium to or among any of the assets acquired by Southern from the FDIC. At the time of the acquisition Management believed that the loan portfolio had a substantial value to Southern in excess of its face value. Management also believed that the deposit relationship had a substantial value if the former ABT depositors could be retained *13 as Southern depositors but did not know how to calculate that value. It was at least in part for this reason that Southern took the position on its tax returns that the premium should be allocated to the acquired loan portfolio. By reason of the mechanics of the acquisition, the depositors' deposits in the ABT branches on Friday, September 20, 1974, were made available to them at the same locations on the Monday following. Hence the deposits were never frozen. In spite of the efforts made by all concerned, Southern had no advance assurance that the former ABT depositors would remain with its new branches. In fact, arrangements were made with the FDIC to have sufficient currency available at the various branches to pay off depositors if runs on any of the branches developed. Out of the deposit base acquired of approximately $112,000,000, approximately $43,000,000 represented demand deposits, slightly less than $14,000,000 were in savings accounts, and about $55,000,000 in time deposits. There were approximately 31,000 demand deposit accounts and 24,000 savings accounts. Of the time deposits, approximately $8,000,000 were in accounts similar to a savings account and the remainder *14 were in certificates of deposit. If certificates of deposit greater than $100,000 are eliminated, approximately $88,000,000 of deposits, the so-called "core deposits" were acquired. [6] As of September 13, 1984, Southern held approximately $33,000,000 in demand deposits consisting of approximately 8,000 accounts and approximately $7,700,000 in time and saving accounts, consisting of approximately 4,700 separate accounts of customers who had been depositors in 1974 in the former ABT branches. Southern's experience with certificates of deposit in excess of $100,000 each was not as satisfactory. [7] All such certificates matured prior to 1984. At the time of the closing, Southern had no detailed information as to the composition of the deposit liabilities. More particularly Southern had no information as to the ages of the ABT core deposits, its experience in account closings (i.e., termination of the deposit relationship) either of the accounts acquired by Southern or at the ABT branches acquired in the transaction. Neither is there in this record any indication that in 1974 Southern had compiled any statistics as to its own aging or closing experience. *15 The value inherent in the intangible which constitutes the core deposit relationship arises out of the expectation that the depositor will continue to be a customer of that particular bank or branch for a period of time in the future. A material source of banking income arises out of the use by the bank of the depositor's money in other banking transactions. There is also a tendency for a depositor to conduct other banking transactions with the depository bank. Deposit accounts are in some respect analogous to customer lists but without the uncertainty and expense attendant on using a customer list to solicit new customers. With an existing deposit account, the customer has been obtained and there is the expectation that the deposit relationship will continue for a period of time. Petitioner's expert, Dr. Bruce W. Morgan, is a member of the firm of Golembe Associates, Inc. (Golembe). He and that firm played an important part in the development of the methodology used by petitioner in this case to value the core deposit relationship. This methodology was developed during the year 1977 in connection with valuation by Golembe of the core deposit relationships of a failed bank. *16 The existence of the methodology became generally known in 1979. [8] The methodology has been used by Dr. Morgan and Golembe in numerous other cases where it was necessary to value deposit liabilities acquired in a transaction or to advise as to a prospective transaction. Dr. Morgan's methodology focuses on the relationship of the customers to the particular banking institution and assumes that a depositor will generally utilize a depository bank for other banking relationships. A deposit customer represents an expectation of future income to the depository bank. The valuation depends on an analysis of the period of time during which the totality of the core deposit relationships will erode, that is the determination of the average period of time during which the deposit customers will remain with the particular bank and the value of the income stream to be realized from the funds on deposit. The object is to determine the present value of the future income that can be obtained from the deposit relationships. Since banks do not normally compile and retain information on the longevity of their *17 deposit relationships, this valuation method requires a special survey as part of the appraisal process in order to estimate or determine the attrition patterns. Golembe was employed shortly prior to February 1, 1984, to undertake valuation of the acquired core deposit relationships. His study included four steps: (i) determination of the amount of the core deposits which were acquired from ABT, approximately $81 million; [9] (ii) determination of the attrition characteristics of those core deposits, (iii) calculation of the net after-tax earnings on the acquired deposits until attrition was completed, and (iv) discount of the earning stream to a present value. To determine longevity or the attrition rate, this methodology requires that a survey be made of account closings during a particular time period. Petitioner did not have the data, either from ABT or its own operations, to permit such a survey to be done for any period of time during the year 1974 or prior thereto. Therefore, in order to determine the longevity characteristics associated with the deposits acquired from ABT in the 1974 acquisition, a survey was made of all transaction accounts (demand, NOW and "super NOW") *18 closings at the former ABT offices still in operation by Southern during the period February 1 through June 30, 1984. [10]
*19 Dr. Morgan assumed that the 1984 characteristics were representative of facts existing during 1974 and prior thereto. [11] Dr. Morgan concluded that the initial value of the acquired deposit intangible was $5.49 million and that it had a useful life of approximately 20 years. Additional Facts Pertaining to the Collateral Estoppel Issue
Petitioner on its consolidated Federal income tax return for the taxable years 1973 through 1978 allocated $4,993,940 out of the bid premium of $5,560,000 to the value of the loan portfolio in excess of its face amount and the remaining premium of $566,060 to goodwill. [12] That portion *20 of the premium allocated to the acquired loans was amortized by petitioner on its income tax returns over the claimed useful life of the loan portfolio. The notice of deficiency dated May 4, 1981, for the year 1974, [13] disallowed this claimed amortization deduction. Petitioner paid the tax deficiency, filed a claim for refund, and filed suit in the U.S. District Court for the District of South Carolina. The primary issue before the U.S. District Court was the amortization of the premium allocated to the loan portfolio in the amount of $4,993,940 but the complaint included an alternative contention that a premium in the amount of $4,202,361 should be allocated to the acquired deposit liabilities, described as the "Deposit Base." Petitioner was successful before the District Court[14] but that Court was reversed on appeal. Southern Bancorporation, Inc. v. United States,732 F.2d 374 (4th Cir. 1984), cert. denied 469 U.S. 1207 (1985). *21 On November 30, 1982, respondent issued a statutory notice for the years 1975-1978, which disallowed the amortization deductions with respect to premiums allocated to the ABT loan portfolios. In its petition filed in this Court on March 2, 1983, while the refund suit was pending, petitioner again asserted as its primary contention that a premium of $4,994,000 should be allocated to the loan portfolio and amortized. In the alternative, petitioner asserted that any portion of the total premium which may not be allocable to the loan portfolio, (to wit the sum of $4,202,361) should be allocated to the deposit liabilities (sometimes referred to as the "deposit base") and amortized over a 10-year period. With leave of Court on September 25, 1984, petitioner amended its petition to delete its primary contention as to amortization of the loan portfolio and to seek amortization of the premium allocated to the deposit liabilities (here described as the "core deposit base") in the amount of $5,491,996. Count III. of the complaint in the District Court alleges: In the alternative, if any portion of the $5,560,000 is allocable to other assets acquired from ABT, such amount is amortizable.
*22 (a) One of the liabilities assumed by the Affiliated Bank in the ABT acquisition was the obligation of ABT to its depositors in the amount of $112,702,998 (the "Deposit Base"). (b) The deposit base while classified as a liability for financial accounting purposes, is an asset, the value of which can be ascertained. * * * (e) The portion of the purchase price which may, in the alternative, be allocated to the deposit base is $4,202,361. * * * (h) The deposit base acquired by Affiliated Bank did not have a useful life greater than 10 years. In his opening statement in the District Court, petitioner's counsel stated that the issue in the case was "premium amortization." Government counsel agreed that such was the issue. One of petitioner's witnesses, John Ballentine, Senior Vice President, testifying in part that with respect to the core deposit liabilities, stated that there was an expectation that the customers of the former bank would be retained. He explained that one of the criteria considered by Southern in making its bid was a sum representing 5 percent of the deposits. On an overall basis Ballentine's testimony before the District Court emphasized the value attributed *23 to the loan portfolio.Another witness, John Philip Southern, Senior Vice President, testified that there was an expectation that the deposits of ABT would remain with Southern. Southern's certified public accountant and return preparer, Robert Carlton Davis, testified on the contrary that it was illogical to attribute value to the deposit base. Petitioner's expert, Dr. Owen Pugh, discussed the deposit base in detail, emphasizing the importance of retaining depositors. In the closing arguments, petitioner's counsel argued that the deposit base had little value but that the premium should properly be allocated to the acquired loans. District Judge Anderson in his findings of fact concluded that some value could and should be attributed to the deposit relationship, (i.e., the deposit base) acquired by Southern, and "that the deposit relationships and the locations acquired have some characteristics of goodwill." Judge Anderson further found that whatever the value of the deposit relationships and the banking locations may have been, that value did not exceed the $566,060 which plaintiffs allocated to goodwill for Federal income tax purposes. In his Conclusion of Facts Judge Anderson *24 held in part: 5. Based on the record, and as found by the Court above, Southern did not acquire any of the traditional elements of goodwill. E.g., Houston Chronicle Publishing Co., 481 F.2d at 1247. The value obtained by acquiring locations and deposit relationships was shown by Plaintiffs to be no greater than $566,060. These elements of value are sometimes viewed as a component of goodwill while in other instances they have been treated as separate nondepreciable assets. Compare Winn-Dixie Montgomery, Inc. v. Commissioner [71-1 USTC P9488], 444 F.2d 677 (5th Cir. 1971) with Concord Control, Inc. v. Commissioner [80-1 USTC P9248], 615 F.2d 1153 (6th Cir. 1980). Under either view, the value acquired as the result of obtaining new banking locations and depositors has been adequately accounted for by Plaintiffs. The Fourth Circuit determined petitioner had failed to carry its burden of proof to show that the loan portfolio had value. Thus petitioner in that litigation failed to overcome the presumption of correctness attached to respondent's determination. The case was remanded with instructions to enter judgement in *25 favor of the Commissioner. In the course of its opinion, in two separate footnotes, the Court of Appeals for the Fourth Circuit noted that petitioner did not pursue its alternative allegation before the trial court that it had paid a premium of approximately $4,200,000 for the deposit base. OPINION Amortization Issue
By amendment to the petition filed on the first day of trial, petitioner bases its case on what originally was its alternative contention, i.e., that the premium paid for certain of the assets of ABT should be allocated to an intangible constituting those deposit relationships represented by the core deposit balances which amounted to approximately $88,000,000. Amortization of this intangible, alleged to be worth $5,491,996 is claimed in specified amounts for the years before the Court based upon calculations made by petitioner's expert, Dr. Morgan. Respondent's opposition is essentially two-fold, that whatever premium petitioner paid is nonamortizable as constituting a portion of goodwill or going concern value and that petitioner is precluded in this case on the basis of collateral estoppel or equitable estoppel. Subsequent to trial, this Court issued *26 our opinion in Banc One Corporation v. Commissioner,84 T.C. 476 (1985), on appeal (6th Cir., Dec. 30, 1985). In Banc One Corporation we held that the taxpayer was not entitled to certain depreciation deductions for core deposits because hindsight statistics were the only evidence submitted by the taxpayer to calculate depreciation. At our request, the parties briefed the application of Banc One Corporation to this case. Predictably respondent takes the position that Banc One Corporation is substantially on all fours while petitioner seeks to distinguish the case. We agree with respondent and for that reason we do not reach the related issue as to whether or not the core deposit relationships are an intangible which is an amortizable asset. [15]
*27 Just as in Banc One Dr. Morgan's report relies upon events occurring years after the date of acquisition of the ABT assets. As we said in that case: This Court and others have repeatedly stated, however, that the determination of the useful life of an asset and the other estimates utilized in computing depreciation must be based upon facts existing as of the close of the taxable year in issue. See, e.g., Western Terminal Co. v. United States,412 F.2d 826 (9th Cir. 1969); Commissioner v. Cleveland Adolph M.R. Corp.,160 F.2d 1012 (6th Cir. 1947); Roy H. Park Broadcasting v. Commissioner,78 T.C. 1093 (1982); Airport Building Development Corp. v. Commissioner,58 T.C. 538 (1972); Westinghouse Broadcasting Co. v. Commissioner,36 T.C. 912 (1961), affd. 309 F.2d 279 (3d Cir. 1962). * * * Indeed, the regulations indicate that depreciation must be computed and its validity judged prospectively, not retrospectively: The reasonableness of any claim for depreciation shall be determined *28 upon the basis of conditions known to exist at the end of the period for which the return is made. It is the responsibility of the taxpayer to establish the reasonableness of the deduction for depreciation claimed. [Sec. 1.167(b)-0(a), Income Tax Regs.] * * * The Fourth Circuit articulated the rationale behind the prohibition against using hindsight evidence to compute depreciation as follows: [T]axation is made too uncertain and controversies too long extended if what is claimed or allowable as of the time the return is filed is made subject to revision and adjustment by the Commissioner or by the taxpayer in the light of events occurring several years later. What depreciation is allowable, therefore, is determinable on the basis of facts known or reasonably predictable when the return is filed and may not be made dependent upon * * * [events] actually realized in subsequent years. [Johnson v. Commissioner,302 F.2d 86, 88 (4th Cir. 1962), affg. a Memorandum Opinion of this Court.] Petitioner's proposed method of depreciation is similar to that of the taxpayers in Manhattan Co. of Virginia, Inc. v. Commissioner,50 T.C. 78 (1968); *29 Holden Fuel Oil Co. v. Commissioner,T.C. Memo. 1972-45, affd. 479 F.2d 613 (6th Cir. 1973), and Midlantic National Bank v. Commissioner,T.C. Memo. 1983-581. In each of those cases, we rejected the taxpayer's computation of depreciation of a customer list based upon the number of customers actually lost each year. The method proposed by petitioner for the years in issue is different only in that it is based upon a sample of the deposit accounts actually lost. We see no reason to distinguish between "total" hindsight and "sample" hindsight. [84 T.C. at 499-501.] Banc One Corporation v. Commissioner,supra, is controlling here. Petitioner's witnesses including Dr. Morgan agree that this study could not have been done prior to or as of the date of acquisition of these ABT branches. The only connection between Dr. Morgan's analysis and the pre-acquisition period arises out of those few accounts included within the survey which were open prior to September 1974. This fact alone does not eliminate the hindsight nature of the asserted basis for depreciation. The methodology upon which the study *30 was based did not even exist in 1974. There is in this record simply no evidence of the prior experience of petitioner or ABT or of the banking industry as a whole. Dr. Morgan's position that the 1984 survey "should, in other words, yield results quite similar to what would have been observed a decade earlier" does not eliminate reliance upon hindsight. Collateral Estoppel Issue
The second issue we address is whether petitioner is estopped by the judgment in Southern Bancorporation, Inc. v. United States,732 F.2d 374 (4th Cir. 1984), (hereinafter "the refund suit") from relitigating the right to amortize the value (if any) of the portion of the premium attributable to the deposit relationships. [16]
*31 Generally, once a claim relating to a particular tax year is litigated, the judgment thereon acts as collateral estoppel in litigation over another tax year with respect to matters actually litigated in the first proceeding. Commissioner v. Sunnen,333 U.S. 591, 598, 599 (1948); Lea, Inc. v. Commissioner,69 T.C. 762 (1978). Collateral estoppel applies to those matters in the later proceeding which were actually presented and determined in the first suit.This rule relieves the Government and the taxpayer of the burden of repetitious litigation over identical questions. Commissioner v. Sunnen,supra;Lea, Inc. v. Commissioner,supra.
Respondent bears the burden of proving petitioners are estopped from relitigating the issue of the amortization of the premium. Rule 142(a). To meet this burden, respondent must prove that the issue was previously presented and determined by a court of competent jurisdiction and that there has been no subsequent modification of the *32 significant facts nor a change or development in the controlling legal principals which might make the prior determination obsolete or erroneous. Commissioner v. Sunnen,supra;Lea, Inc. v. Commissioner,supra.Collateral estoppel is confined to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. Where the situation is vitally altered between the time of the first judgment and the second, the prior determination is not conclusive. Commissioner v. Sunnen,supra.
In the present case petitioner contends that it is not collaterally estopped from showing that the acquired deposit relationships are amortizable because the value of the core deposits and amortization of that value were not put in issue in the refund suit. Petitioner claims the District Court and Court of Appeals did not assign any value to any asset other than the acquired loan portfolios and therefore the only issue litigated in the refund suit was the tax basis and amortization of the acquired loan portfolio. *33 Contending that when the Fourth Circuit reversed the District Court the question of whether the premium was to be allocated to deposit relationships or going-concern value was left unanswered, petitioner argues that the question can be therefore raised in the present case. In contrast, respondent contends that the question of what portion of the premium is attributable to the deposit relationships was previously presented and determined in the refund suit. The primary issue in the refund suit, as respondent sees it, was whether petitioner was entitled to amortization deductions for the premium paid to acquire ABT. The District Court found that $4,993,940 of the premium was allocable to the value of the loan portfolio, and that the value obtained by acquiring locations and deposit relationships was shown by petitioner to be no greater than $566,060. Respondent claims the Court based its findings on evidence presented by petitioner that portions of the premium were attributable to the loan portfolio and to the deposit relationships. Therefore, respondent reasons the District Court's decision necessarily subsumed the question of what portion of the premium was attributable to the *34 deposit relationships and whether or not that sum was subject to amortization. We agree with respondent. The issue in this case is whether petitioner is entitled to amortization deductions for some portion of the premium paid to acquire ABT. That issue was raised and litigated in the refund suit. In that case petitioner raised alternative theories in support of its amortization deductions. Petitioner claimed that a portion of the premium was attributable to the loan portfolio, or that any portion of the premium not allocable to the loan portfolio was attributable to the deposit relationships. Petitioner presented all of the evidence available at that time to prove the value of both. That evidence was necessarily conflicting and the District Court chose to rely on the theory that the premium was attributable primarily to the loan portfolio. However, the perceived lack of merit to petitioner's case at that trial led the Court of Appeals to overturn the District Court's findings. The end result was that no amortization deductions were allowed. However, simply because petitioner did not prevail on its alternative theory or did not have enough evidence to support the theory at *35 trial does not mean that the theory was not litigated. [17]
We have previously held and we adhere now to the principle that having raised an issue and having presented evidence bearing on it, a petitioner cannot remove the issue from a case by failing to argue it and thereby preserve the opportunity to litigate the question in a subsequent proceeding after failing to obtain a favorable decision on those legal theories argued. We specifically stated that: We are not willing to subscribe to the contention that having raised an issue and having presented evidence bearing on it, a petitioner can remove that issue from the case by failing to *36 argue it and thereby preserve to himself an opportunity to litigate the question in a subsequent proceeding if he fails to get a favorable decision on the legal theories which he does argue. If such a contention prevailed, litigation could be continued indefinitely depending upon the ingenuity of counsel in marshalling the facts and rearranging the points of his arguments.The policy of the law is to the contrary. Cf. Harley Alexander,22 T.C. 318. [Fn. ref. omitted. Jacob's Fork Pocahontas Coal Co. v. Commissioner,24 T.C. 60, 68 (1955).] See also Starker v. U.S.,602 F.2d 1341 (9th Cir. 1979). In addition we note that the controlling facts in this case have not changed from the time of the refund suit. Controlling facts are the ultimate facts upon which a transaction is based. See Lea, Inc. v. Commissioner,69 T.C. 762 (1978). The controlling facts in the refund suit are identical to those presented here. Simply because petitioner now has different expert testimony and a new theory upon which to attribute a larger value to the deposit relationships does not entitle petitioner to relitigate whether *37 the premium is amortizable on the basis that it is attributable to deposit relationships. See Stern & Stern Textiles, Inc. v. Commissioner,26 T.C. 1000 (1956), affd. 263 F.2d 538 (2d Cir. 1959). Since we have held for respondent on collateral estoppel, we need not discuss his equitable estoppel, judicial estoppel, or "duty of consistency" arguments. For the foregoing reasons, we find for respondent. Decision will be entered for the respondent.
Footnotes
1. Numerous adjustments were determined in the notice of deficiency and asserted to be erroneous in the petition in addition to disallowance of amortization of this "premium." The two issues described in the text are the only ones tried by the parties. To the extent that the remaining adjustments have not been settled between the parties, we deem them to have been conceded by petitioner.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
3. It is not always clear from this record whether particular executive officers were acting or speaking on behalf of, or for petitioner or Southern or both, or the extent to which the board of directors of petitioner was involved as such. We are convinced that informally, if not formally, all persons involved kept in touch with senior executives and crucial directors. For convenience, we use the term "Management" to reflect in general the decision-making personnel of Southern and petitioner and their senior assistants collectively.The issue before us is unaffected by this ambiguity. ↩
4. Since the ABT liabilities exceeded the assets, the FDIC agreed to make a cash deposit equal to this difference, reduced by the "premium." As a result of post-closing adjustments, the premium was reduced to $5,535,412. However, petitioner continued to use as the premium the sum of $5,600,000. The FDIC eliminated from the proposed transaction all or substantially all of the outstanding ABT loans which the FDIC classified as of doubtful collection.↩
5. Three of these branches have since been closed by Southern.↩
6. Petitioner's expert based his opinion on the assumption that the core deposits amounted to $81,000,000. ↩
7. The deposit liabilities assumed in the transaction included approximately $23,000,000 of these large certificates of deposit but that amount had dropped down to about $15,000,000 by the end of 1974.↩
8. There is no evidence as to when petitioner became aware of this methodology.↩
9. Actually the amount was close to $88,000,000. ↩
10. Dr. Morgan's written report, Exhibit 46, states that the survey period was in 1984 although the average balances in the transaction accounts were determined as of 1983. Southern was asked to record every closing of a transaction account at every one of the acquired branch offices then being maintained by Southern. With respect to each account closing, the bank was asked to record the closing date, the opening date of the account, the office at which the closing took place, and the 1983 average balance in the account. A majority of the accounts surveyed came into existence subsequent to September 20, 1974, the acquisition date. It is Dr. Morgan's theory that the circumstances which caused account holders to close their accounts are reflective of community characteristics, that the communities in which these branches were located are stable communities and as a result "* * * the longevity structure of these relationships that we observed in the spring of 1984 should not have been very different from what we would have observed if we could have conducted the same study back in the spring or whatever of 1974."↩
11. In the opinion of Dr. Morgan, "the demographic characteristics of the area in which the former offices are located * * * and visual inspection of their communities and sites, suggest that these longevity characteristics would tend to be quite stable over time." He also testified that "the longevity structure of these relationships [the deposit relationships] that we observed in the spring of 1984 should not have been very different than what would have been observed if we could have conducted the same study back in the spring or whatever of 1974."↩
12. Although the premium was actually reduced to $5,535,412 as a result of post-closing adjustments, petitioner used the original figure on its tax returns. ↩
13. The year prior to the years before us.↩
14. See Southern Bancorporation, Inc. v. United States, an unreported case ( D.S.C. 1983, 52 AFTR 2d 83↩-5518, 83-1 USTC par.
15. As we have noted, the bid made by petitioner for the assets of ABT included a premium which was based at least in part on a percentage of the deposit balances acquired. Dr. Morgan also testified that there was an "old rule of thumb" that this intangible was worth about 6 percent of the deposit balances. However, petitioner has not seriously argued that it should be entitled to an amortization deduction based on industry experience as of 1974 and the evidence in this case would not support such a claim if made. Neither do we find it necessary to discuss some of the flaws and gaps which are apparent in Dr. Morgan's survey, analysis, and conclusions. For present purposes only we accept (but do not decide) that the acquired deposit relationships constitute an identifiable asset having substantial value.↩
16. Respondent first raised this issue in a motion for summary judgment filed prior to trial. We concluded that it was inappropriate to decide this issue in a summary judgment framework. While our conclusion that this case is governed by Banc One Corporation v. Commissioner,84 T.C. 476↩ (1985) is dispositive, we nevertheless conclude that respondent is entitled to our opinion on collateral estoppel.
17. We recognize that the Court of Appeals apparently considered the deposit base theory as abandoned. See footnotes 5 and 6 in Southern Bancorporation, Inc. v. United States,732 F.2d 374, 377↩ (4th Cir. 1984). However, it appears to us that petitioner did not abandon the theory until after its presentation of available evidence and the recognition by its counsel at the end of the trial that the record did not support the theory.