BUSINESS SERVICE INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Business Service Industries, Inc. v. Commissioner
Docket No. 17209-79.
United States Tax Court
T.C. Memo 1986-86; 1986 Tax Ct. Memo LEXIS 521; 51 T.C.M. (CCH) 539; T.C.M. (RIA) 86086; March 4, 1986. Albert Kimbrough Gregory,Hubert A. McBride,James T. Bland, Jr; and James R. Hall, for the petitioner. Shuford A. Tucker, Jr., for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Taxable Year Ended
Amount
September 30, 1975
$15,304.00
September 30, 1976
5,582.00
September 30, 1977
21,411.59
*522 Due to concessions, the only issue remaining for our determination is whether petitioner is entitled to deductions for depreciation of customer contracts and/or a franchise acquired in conjunction with the purchase and subsequent liquidation under section 334 [1] of Business Music Corporation. FINDINGS OF FACT Some of the facts have been stipulated and are so found, the stipulation of facts and exhibits attached thereto being incorporated herein by reference. Business Service Industries, Inc. (BSI), a Tennessee corporation, had its principal place of business at all times material hereto in Memphis, Tennessee, and filed its corporate income tax returns for the fiscal years 1975, 1976 and 1977 with the Memphis Service Center. During the years under consideration, petitioner owned and operated a business which supplied music to various enterprises in the Memphis area. The business was originally founded in 1946 by E. A. Alburty, when he caused *523 his corporation, Business Music Corporation (BMC), to obtain a franchise agreement with "MUZAK" under which BMC had the exclusive right to sell Muzak's musical services to customers located in Shelby County, Tennessee. For the most part, such customers are industries, retail stores, and offices. Muzak is an international corporation which transmits musical programs to its franchisees or their customers. Its programming is designed to increase worker productivity and is described in one of its advertising brochures as follows: Muzak isn't just music. It's more. Scientifically programmed in segments, each Muzak segment is designed to avoid depressing minor modes. It delivers a constantly ascending psychological lift, a lift which mitigates stress. At the same time, it masks numbing noise. What does this ascending movement, known as Stimulus Progression, do? It enhances employee morale. It makes employees feel management cares about their well-being. It reduces and relieves stress. It cuts down on boredom. It increases efficiency. When Mr. Alburty's corporation first acquired the Muzak franchise, the system was virtually unknown in Memphis and he had no customers, business *524 contacts or employees. However, with years of hard work and "pounding the pavement" he obtained numerous customers and built an excellent reputation for Business Music Corporation. In fact, Muzak considered his business to be "the textbook case of how a Muzak franchise should be operated." In 1973, Mr. Alburty decided to withdraw from the business of BMC and to retire. Consequently, he approached William Geralds about a possible purchase of BMC. At that time, Mr. Alburty and his wife owned 90 percent of BMC's outstanding stock. The other ten percent of the stock was owned by BSI, whose stockholders were: Mr. Geralds, who had been serving as the business manager of BMC for about 18 months and who was also the president of a local bank; Leo Valvoda, who had been the sales manager of BMC for 20 years; and Thomas Gantert, who had been BMC's chief engineer for about the same period. Customer Contracts
Negotiations concerning the method and the price of the purchase continued over many months. At first, Mr. Geralds insisted on purchasing the assets of BMC in order to establish a separate value for each asset and to limit the purchaser's exposure to undisclosed liabilities. *525 Mr. Alburty, however, refused to sell the assets. He insisted on a sale of the stock. During the negotiations, Geralds and Gantert examined each of the 1,339 location contracts which BMC had with its 814 customers in order to ascertain the acquisition and termination dates and the gross income value of each contract. They concluded that the gross value of the contracts, without taking service expenses into account, was approximately $2,500,000. Copies of the contracts, most of which were for periods of five years, and the analysis made by Geralds and Gantert were supplied to Geralds' bank which agreed to finance the purchase by BSI using the contracts as collateral. At this point, Geralds, Gantert, and Valvoda caused BSI to purchase all of the BMC stock owned by Mr. Alburty and his wife for $1,175,000, plus the assumption of certain liabilities; and, on November 15, 1973, they liquidated BMC and its subsidiaries into BSI pursuant to section 334(b)(2). At the date of the liquidation, Jarvis Greer, a certified public accountant with the firm of Price-Waterhouse, was employed by BSI to determine the basis of each asset acquired by BSI from BMC. After consulting with Mr. Alburty *526 and the shareholders of BSI, Mr. Greer determined that the basis of each asset for section 334(b)(2) purposes was as follows: Cash
$ 265,791
Accounts Receivable
52,202
Inventory
27,600
Pre-Paid Expenses
1,495
Membership and Deposits
1,415
Securities
31,187
Fixed Assets
134,745
Leasehold Interest
5,545
Multiple Contract
26,748
Income-Producing Contracts
646,098
Franchise and Goodwill
[2] 7,886
Total
[3] $1,200,712
In the process of making his allocations, Mr. Greer also examined all of the 1,339 contracts and determined the gross income that could be expected from each contract and discounted this amount to its then present value using a factor of 10 percent and a useful life of 15 years. He then estimated and deducted various expenses from *527 the present value of the total gross income and arrived at a total fair market value for the contracts of $819,328. Pursuant to section 334(b), the total acquisition costs of $1,200,712 for the assets acquired by BSI was first allocated by Mr. Greer to cash and cash equivalent items. The balance of the purchase price, which according to Mr. Greer's computation was $913,746, was then allocated among the remaining assets, including the contracts, on the basis of their relative fair market values. In this manner, the contracts were determined to have a basis of $646,098. In arriving at a useful life of 15 years for the contracts, Mr. Greer noted that attrition for the contracts in the three years preceding the acquisition by BSI had averaged five percent per year. He took this to indicate a total useful life of 20 years for the contracts. Since the contracts had been in place for an average of 56 months at the date of acquisition, Mr. Greer concluded that they had a remaining useful life of 184 months, which he rounded to 180 months, or 15 years. At trial, petitioner called as an expert witness Barrie K. Driscoll, a partner with the accounting firm of Coopers & Lybrand. Mr. *528 Driscoll, as the director of his firm's Engineering and Evaluation Group, has been responsible for the preparation of many valuation studies of tangible and intangible assets for the purpose of determining capital values, depreciation deductions, investment tax credits, and local property taxes. He has been associated with Coopers & Lybrand for 13 years and prior to that he served for eight years as a revenue engineer with the Internal Revenue Service. At petitioner's request, Mr. Driscoll determined the value of the service contracts, goodwill, and the Muzak franchise of BMC as of the date of BMC's liquidation. He also made a determination as to the useful life of each of the these assets. To arrive at a value for the customer contracts, Mr. Driscoll used the income method of valuation. In his report he explains the method and his conclusions as follows: Step One:
Assuming no attrition of Original Subscribers, the future annual revenue potential of the Acquired Contracts was estimated at $705,000, the amount of music revenues collected in the year ended September 30, 1973. Step Two:
A review was made of the survival characteristics of subscribers serviced by *529 BMC over the ten year period prior to the valuation date. The characteristics of subscriber survival and terminations occurring during this elapsed period indicated that the Original Subscribers would discontinue their business at an annual rate of approximately five percent. [4]
In accordance with this rate, survivor percentages were applied to the initial future aggregate annual revenue potential from the Acquired Contracts, as of valuation date, in order to forecast the estimated annual (declining) revenue that will be realized from the Acquired Contracts over the duration of their economic life (Schedule One). [5]
Step Three:
A pre-tax profitability factor was applied to the annual revenue potential determined in Step Two to calculate the annual pre-tax income potential inherent in the Acquired Contracts. The pre-tax profitability factor of 18 percent was determined from an analysis of BMC's historical operating statements. The 18% factor includes an allowance for a return on the net tangible investment that will be required for the future servicing of the Acquired Contracts. The recognition of this allowance results in an attribution of income to Acquired Contracts *530 only to the extent of earnings in excess of a fair rate of return on net tangible investment. Net tangible investment represents the excess of total tangible assets over current liabilities. 9/1/63 to 9/1/73
Locations
Customers 9/1/63
378  Still Active Customers as of 9/1/73
210  Cancellations from 1963 to 1973
168  Cancellation Rate over 10 Year Period
44.44%
Annual Rate of Cancellation From
9/1/63 to 9/1/73 (120 Months)
* 4.74%
9/1/73 to 2/1/83
Customers 9/1/73
1339  Still Active Customers as of 2/1/83
669  Cancellations from 9/1/73 to 2/1/83
653  Cancellation Rate over 113 Months
48.77%
Annual Rate of Cancellation
5.18%
SCHEDULE ONE BUSINESS SERVICE INDUSTRIES COMPUTATION OF ANNUAL REVENUE ATTRIBUTABLE TO EXISTING MUSIC SERVICE CONTRACTS ACQUIRED IN 1973 YEAR
SURVIVING PERCENT OF
SUBSEQUENT
ACQUIRED CUSTOMER ACCOUNTS
AVERAGE
TO
REVENUE
ACQUISITION
END
START
MID
IN PERIOD
FACTOR
([1]) 20 PRESENT
100
([2]) 705000
1
95 100
97.5
687375
2
90 95 92.5
652125
3
85 90 87.5
616875
4
80 85 82.5
581625
5
75 80 77.5
546375
6
70 75 72.5
511125
7
65 70 67.5
475875
8
60 65 62.5
440625
9
55 60 57.5
405375
10
50 55 52.5
370125
11
45 50 47.5
334875
12
40 45 42.5
299625
13
35 40 37.5
264375
14
30 35 32.5
229125
15
25 30 27.5
193875
16
20 25 22.5
158625
17
15 20 17.5
123375
18
10 15 12.5
88125
19
5  10 7.5 52875
20
0  5  2.5 17625
*531 Valuation of Future Residual Earnings
The value of the residual income emmanating [sic] from the potential income realization inherent in the Acquired Contracts is dependent upon the present worth of the following factors: 1. Pre-tax income realizable from the Acquired Contracts less income taxes assumed at 50 percent; plus 2. Annual amortization provisions applicable to the subject contracts, after income taxes assumed at 50 percent. These factors can be expressed by the following algebraic equation: V = sum of r Income (1-t) for all years; plus RWV (t) for all years Where V = Fair market value r = Present worth factor to be applied to pre-tax income realization R = Present worth factor applicable to amortization provisions W = Decimal equivalent of the annual rate of amortization *532 t = 50 percent income tax rate. The fair market value of the Acquired Contracts was determined by substituting in the above equation the appropriate factors developed on Schedule Two, [6] as follows: V =
$736,059 (1-0.5) + 0.58 (0.5) V
=
$368,030 + 0.29 V
0.71V =
$368,030
V =
$518,363
$518,400 (rounded)
Schedule Two BUSINESS SERVICE INDUSTRIES, INC. COMPUTATION OF AVERAGE PRE-TAX EARNINGS PERCENTAGE for the years ended September 30, 1971, 1972 and 1973 Average Revenues,
Expenses and NTI
Attributable to
Acquired Service
Contracts (1971-1973)
([1])
Average Consolidated
Operating
Revenues, Expenses
and NTI of
Percent of
BMC and East
Average
Percent to
Arkansas for the
Consolidated
Service
Years ended 1971,
Operating
Contract
1972, 1973
Average
Revenues
Reventues
Operating Revenues
$687,881
$638,560
92.8%
100.0%
Direct Expenses
199,058
143,455
72.1 22.5 Indirect Expenses
435,657
359,417
82.5 56.3 Net Tangible
Investment (NTI)
271,485
223,975
82.5 Return on Net
Tangible Investment
at a 10% rate
27,149
22,400
82.5 3.5 82.3 Pre-tax Earnings Percentage (Average
for 1971, 1972 and 1973)
17.7%
Rounded 18%
*533 As stated in his report, Mr. Driscoll concluded that the customer contracts had a value on the date of the acquisition of $518,400 and a remaining useful life of 15 years. Franchise and Goodwill
BMC acquired the Muzak franchise for the Memphis area in 1946. The franchise was renewed for BMC in 1961. When BSI acquired the assets of BMC in 1973, the transfer of the franchise by BMC to BSI was approved by Muzak and at the same time the franchise was extended to January 31, 1986. The franchise has a stated life or period of ten years. Although it is not automatically renewable, Mr. John Carroll, vice president of Muzak, testified at the trial that in his opinion there was no reason to believe at the time of the liquidation or at trial that the franchise would not be continued by Muzak. In fact, he testified Muzak wa pleased with the transfer and with the *534 subsequent progress of the Memphis franchise. On July 10, 1975, Mr. Alburty, then acting as president of BSI, received a letter from a Muzak official in which it was stated: I take great pleasure in advising that your franchise has won charter membership in the Muzak "Top 10" to be given tangible expression in a handsome engraved wall plaque. The "Top 10" has been established, for the first time, to pay recognition to those franchises ranking in the top ten in new sales, among nearly 300 Muzak franchises internationally for the past calendar year. On September 28, 1982, Mr. Geralds received a letter from Muzak which included the following: I want to congratulate you on having added the Blytheville, Arkansas Franchise to the Memphis group. I feel this is a tremendous vote of confidence in us, and the MUZAK system. I cannot think of a better steward for the franchise. In the opinion of Mr. Driscoll, the franchise agreement had a value similar in nature but considerably less in value to the contracts. He testified that this was true because the franchise also tended to attract new customers and to counter the attrition of old customers. In his opinion, the value of the franchise *535 was $124,898 including any goodwill that BMC possessed at the time of the acquisition. In his opinion, the $124,898 represented a non-amortizable intangible asset. On September 30, 1973, the shareholders' equity in BMC was $293,218. During the fiscal years ending on September 30, 1971, 1972 and 1973, BMC had an excess of revenues over expenses before federal and state income taxes of $49,905, $61,985, and $66,849, respectively, for an annual average of $59,580. In 1963, BMC had 378 location contracts. In 1973, it had 1,339 contracts, including 210 of the 378 contracts it had in 1963. In 1983, BMC still had 669 of the 1,339 contracts in effect in 1973. The location contracts almost always contained a five year period with automatic renewals but were cancelable by either party after five years. The monthly billing under some of the contracts increased substantially with renewals. For instance, Memphis Furniture's monthly billing increased from $55.27 in July of 1961 to $499.25 by February of 1982.And Shoney's monthly billing increased from $472.71 in 1973 to $1,970.70 in 1982. On its returns for 1975, 1976 and 1977, petitioner claimed deductions for amortization of the service *536 contracts using an estimated useful life of 15 years. Petitioner did not attempt to amortize on its returns the basis of $7,886 allocated by Mr. Greer to the Muzak franchise and goodwill which BSI acquired from BMC. In its petition ahd at trial, petitioner contended that no part of the purchase price is allocable to goodwill and that if any part of the purchase price is determined to be properly allocable to the franchise, it is amortizable over ten years (the stated period of the franchise) or, in the alternative, over 12 years and two months (the period for which the franchise was extended by Muzak at its acquisition by BSI). Respondent's contention is that no part of the purchase price is amortizable by petitioner over any period. OPINION During the taxable years in issue, petitioner was engaged in the business of supplying music to various customers under a Muzak franchise which petitioner had acquired in 1973 together with 1,339 customer contracts through the purchase of all of the stock in and subsequent liquidation of Business Music Corporation. We must determine whether petitioner is entitled to an allowance for depreciation on the customer contracts and/or the Muzak *537 franchise. These inquiries constitute factual issues on which petitioner has the burden of proof. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Customer Contracts
Under section 167(a), a taxpayer is entitled to a reasonable allowance for the exhaustion of property used in a trade or business. The term "property" as used in section 167(a) includes intangibles such as patents and copyrights. Section 1.167(a)-3, Income Tax Regs. Furthermore, respondent has acknowledged that it may also include such items as "customer and subscription lists, location contracts, insurance expirations," and other assets of a similar nature. Rev. Rul. 74-456, 1974-2 C.B. 65. For the intangible asset to qualify under section 167(a), it must be known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy. The intangible *538 must also have an ascertainable value (cost basis) which is separate and distinct from goodwill. Ralph W. Fullerton Co. v. United States,550 F.2d 548, 550 (9th Cir. 1977); Houston Chronicle Publishing Co. v. United States,481 F.2d 1240, 1250 (5th Cir. 1973), cert. denied 414 U.S. 1129 (1974); section 1.167(a)-3, Income Tax Regs.
Respondent agrees with petitioner's allocation of the purchase price under section 334 as between the cash and its equivalent, the tangible assets, and the intangible assets received by petitioner upon the liquidation fo BMC. Consequently, the controversy exists only with respect to what part, if any, of the $646,098 allocated by petitioner to the intangibles is subject to an allowance for depreciation under section 167(a). On its returns petitioner allocated the entire amount to the location contracts and claimed a deduction for depreciation using a useful life of 15 years. At trial and on brief, petitioner contends that if some part of the $646,098 is properly allocable to the franchise that part is depreciable over the useful life of the franchise which according to petitioner *539 is 10 years or, in the alternative, 12 years and two months. Respondent's primary contention is that no part of the $646,098 is subject to depreciation because it all represents goodwill or going concern value, which are not depreciable. Finally, he contends that even if some part is properly allocable to the contracts, petitioner is not entitled to depreciation because petitioner has failed to establish that the contracts have an ascertainable useful life and a value which is separate and distinct from goodwill. With respect to whether or not the location contracts had a value which was separate and distinct from the goodwill or going concern value of BMC, we agree with petitioner. The contracts were carefully and individually analyzed at or before their acquisition by at least three separate groups or parties who had knowledge of the situation and who concluded that the contracts had a substantial value of their own. First, Mr. Geralds and Mr. Gantert, both of whom were familiar to some extent with the contracts and the business of BMC (Mr. Geralds having been the manager of the company for 18 months and Mr. Gantert having been its chief engineer for 20 years), examined each *540 of the 1,339 contracts and concluded that the contracts had a gross income potential of $2,500,000.Secondly, Mr. Geralds' bank examined the contracts and concluded that they had a sufficient value to permit the bank to finance the purchase of the stock at $1,175,000 by using the contracts as collateral. Thirdly, Mr. Greer, the certified public accountant for petitioner, examined each of the contracts and reduced their potential gross income by estimated expenses and concluded that they had a net fair market value of over $819,000. We are satisfied, therefore, that the contracts had a substantial value at the time of their acquisition. Furthermore, we are also satisfied that their value was separate and distinct from any goodwill associated with BMC or the Muzak franchise. The separate and distinct nature of the value of the location contracts is readily apparent from the fact that the bank was willing to finance the purchase of the stock by BSI with the contracts being used as the only collateral. The above conclusion is supported by Manhattan Co. of Virginia, Inc. v. Commissioner,50 T.C. 78 (1968) and Super Food Services, Inc. v. United States,416 F.2d 1236, 1240 (7th Cir. 1969). *541 In Manhattan Co. of Virginia, Inc. v. Commissioner,supra, a taxpayer in the laundry business purchased the names and addresses of a number of home pickup and delivery customers from another laundry. We concluded that the list of customers constituted an intangible asset with an ascertainable value and a determinable useful life and therefore qualified for depreciation under section 167(a). Furthermore, in Super Food Services, Inc. v. United States,supra, it was stated at 1240: In our view, * * * it is also immaterial whether these contracts were acquired separately or as part of a going business. Any quarrel with the going concern value of contracts acquired as part of a business is properly directed to the allocation to be made between goodwill and the contracts purchased and should not be relied on as requiring a complete denial of depreciation deduction to contracts shown to have a limited useful life. See also Holden Fuel Oil Co. v. Commissioner,T.C. Memo. 1972-45, affd. 479 F.2d 613 (6th Cir. 1973). We *542 also agree with petitioner that the location contracts in this case had an ascertainable useful life of 15 years, which was clearly determinable in the manner used by Mr. Greer by reference to the previous attriotion rate of BMC. The useful life of the laundry list involved in Manhattan Co. of Virginia, Inc. v. Commissioner,supra, was determined in a similar manner and approved by us at 50 T.C. 93. See also Super Food Services, Inc. v. United States,supra;Holden Fuel Oil Co. v. Commissioner,supra;Burnet v. Niagara Falls Brewing Co.,282 U.S. 648 (1931); and Northern Natural Gas Co. v. O'Malley,277 F.2d 128 (8th Cir. 1960), wherein it was held that "a reasonable approximation" of the rate of depreciation or exhaustion is sufficient. However, with regard to the question of value, we are unable to agree with petitioner's allocation of the entire $646,098 to the customer contracts. Obviously, a franchise as well known as Muzak had some value and even petitioner's own expert so acknowledged. He, however, was unable to separate the value of the franchise from the *543 goodwill of BMC and concluded that the two together had a value of $124,898. From the record as a whole we are inclined to agree with petitioner's expert. We also note that a substantial portion of respondent's brief is devoted to an attempt to develop goodwill for BMC through its ownership of the Muzak franchise. It appears, therefore, that respondent also has difficulty in separating the value attributable to BMC's goodwill from the value attributable to the franchise and its popularity and favorable position in the field. From all of the foregoing, we conclude with respect to value that the $518,363 placed upon the contracts by Mr. Driscoll is correct. Franchise and Goodwill
Under section 167(a)(1) a reasonable allowance for the amortization of a franchise is also permitted if the taxpayer can establish that the useful life of the franchise can be estimated with reasonable accuracy. No depreciation allowance is permitted if the asset's useful life is indefinite or unlimited. Section 1.167(a)-3, Income Tax Regs.; Toledo TV Cable Co. v. Commissioner,55 T.C. 1107, 1117 (1971), *544 affd. per curiam 483 F.2d 1398 (9th Cir. 1973); Gulf Television Corp. v. Commissioner,52 T.C. 1038, 1056-1057 (1969). In determining the useful life of a franchise, its prescribed expiration date does not necessarily makr the end of its useful life. Renewals must be taken into account. The useful life may be for an indeterminate duration if the franchisee's renewal for an indefinite period is "reasonably certain." Birmingham News Co. v. Patterson,224 F. Supp. 670, 676 (N.D. Ala. 1963), affd. per curiam 345 F.2d 531 (5th Cir. 1965); Gulf Television Corp. v. Commissioner,supra at 1056-1057; Knipe v. Commissioner,T.C. Memo. 1965-131, 24 T.C.M. 668, 691, 34 P-H Memo T.C. par. 65,131 (1965), affd. per curiam sub nom. Equitable Publishing Co. v. Commissioner,356 F.2d 514 (3d Cir. 1966). However, if its renewal is not "reasonably certain" the franchise's stated term will measure its useful life. Whether future renewals are reasonably certain is a question of fact. Toledo TV Cable Co. v. Commissioner,55 T.C. at 1117; Westinghouse Broadcasting Co. v. Commissioner,36 T.C. 912, 921 (1961), *545 affd. 309 F.2d 279 (3d Cir. 1962), cert. denied 372 U.S. 935 (1963). The facts pertaining to the useful life of petitioner's franchise lead us to conclude that its renewal by Muzak for an indefinite period is "reasonably certain." As recited in our findings of fact, the Muzak corporation was pleased with the manner in which the Memphis franchise was operating both before and after the sale to BSI. Mr. Alburty acquired the original Muzak franchise in 1946 and it was renewed in 1961. In 1973, when petitioner acquired BMC, the franchise was extended to January 31, 1986. Further, Muzak granted an additional franchise to petitioner in 1982 with the sentiment that there could not be a "better steward." Finally, John Carroll, a vice-president of Muzak, opined that there was no reason to believe that petitioner's franchise would not be continued. Based on these facts and the record as a whole, we find that the franchise did not have an ascertainable limited life. Therefore, petitioner would not be entitled to depreciation deduction with respect to the franchise even if a separate value could be established for it. Respondent argues that petitioner is not *546 entitled to a depreciation deduction for the customer contracts or the franchise becaue their value is indistinguishable from the value paid for goodwill of BMC, which is not subject to depreciation. In conclusion, we are satisfied that BMC did possess goodwill which had commanded customer loyalty in the past and would attract new customers in the future.We are also satisfied, however, that the amount properly attributable to goodwill is included in the $124,898 allocated by Mr. Driscoll to the franchise. Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, during the years in issue, unless otherwise indicated.All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.↩
2. Although Mr. Greer determined at this time that the Muzak franchise and goodwill had a combined value of $10,000 and a conbined basis of $7,886, on its returns for fiscal years 1974, 1975 and 1976, petitioner did not show any value for the franchise or goodwill on its balance sheets, nor did it attempt to amortize these times. ↩
3. The total includes the $1,175,000 plus the liabilities assumed by BSI.↩
4. See attached page 7a. ↩
5. See attached page 7b.↩
*. Includes additional annual .3% factor where existing contract cancelled and where new subscriber entered into new contract at same location.↩
1. 20 yr. useful life determined by utilizing percentage of average annual cancellation rate of 5% for the years 9/1/63 to 9/1/73. ↩
2. $705,000 Music Service Revenues were obtained from the unaudited financial statements of Business Music Corporation and East Arkansas Commercial Services, Inc. as compiled by Touche Ross & Co. for the year ended September 30, 1973.↩
6. See attached page 8a.↩
1. The financial information reflected in this column was obtained from the unaudited financial statements of Business Music Corporation and East Arkansas Commercial Services, Inc. as compiled by Touche Ross & Co. for the years ended September 30, 1971, 1972 and 1973, Joint Exhibit 21-U and 22-V to Stipulation.↩