NEWARK MORNING LEDGER CO., as Successor to the Herald Company, Star Ledger Plaza, Newark, New Jersey 07101, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Civ. A. No. 88–4846.

United States District Court, D. New Jersey.

April 3, 1990.

Donald A. Robinson, Albert H. Turkus, Robinson, Wayne & LaSala, Newark, N.J., for plaintiff.

Gregory S. Hrebiniak, Dept. of Justice, Tax Div., Washington, D.C., for defendant.

## OPINION

SAROKIN, District Judge.

### Introduction

This action involves the issue of whether the acquisition of existing paying subscribers as part of an ongoing group of newspapers warrants a tax deduction for the depreciation and amortization of the value of those subscribers as an asset separate and apart from goodwill.

The parties concede that the issue is a factual one, and that in order to prevail plaintiff has the burden of proving that as of May 31, 1977, said subscribers had limited useful lives, the duration of which can be estimated with reasonable accuracy, and ascertainable values separate and apart from goodwill.

■ The court finds, as more specifically hereinafter set forth, that plaintiff has met its burden. In summary, it is self-evident that the subscribers themselves as of a certain date have limited useful lives, because the subscriptions by necessity will terminate upon the death of their respective subscribers. Secondly, plaintiff has presented competent evidence that the subscriptions also have limited useful lives and will terminate for a variety of other reasons prior to the death of their respective subscribers. Either based upon the inevitable death of the *subscribers* or the statistical evidence submitted by plaintiff and the uncontroverted expert opinions that the *subscriptions* have limited useful lives which can be estimated with reasonable accuracy, plaintiff has clearly established that the paying subscribers (or subscriptions) of the acquired newspapers had limited useful lives, the duration of which can be and has been estimated with reasonable accuracy. Indeed, the parties have entered into a stipulation establishing the useful lives of the subscribers for each of the newspapers involved, in the event that this court finds for the plaintiff.

As to the second prong, the court recognizes and accepts that goodwill is the expectancy that former customers will be retained—that there will be continued patronage. However, one must distinguish between a galaxy of customers who may or may not return, whose frequency is unknown, and whose quantity and future purchases cannot be predicted, against subscribers who can be predicted to purchase the same item, for the same price on a daily

basis. Although newspaper subscribers are under no legal obligation to continue their subscriptions, expert opinion and the evidence presented coupled with common sense and experience leads inescapably to the conclusion that the income derived from such paying subscribers will recur, which, in turn, permits the ascertainment of value separate and apart from goodwill. The income derived from the subscribers permits the calculation of value over the useful lives of the subscriptions or subscribers, and renders the subscribers acquired subject to valuation as an asset separate and apart from goodwill.

## Discussion

The following shall constitute the court's findings of facts and conclusions of law:

## Findings of Fact

Plaintiff, Newark Morning Ledger Co. ("Morning Ledger"), is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Newark, New Jersey. Stip. para. a. Morning Ledger is a successor by merger to The Herald Company ("Herald") which, prior to its merger into Morning Ledger, published daily newspapers in eight Michigan communities, *inter alia* (the "Booth newspapers"). Stip. para. b, c.

This income tax case involves Herald's claim to depreciation deductions with respect to assets useful in its business, i.e., the existing relationships with the subscribers of the Booth newspapers acquired on May 31, 1977 (sometimes referred to as the "paid subscribers"). Herald claimed deductions for depreciation with respect to those subscriber relationships when it filed its tax returns for the taxable years 1977 through 1980. The Internal Revenue Service (the "Service") disallowed those deductions, thereby determining an increased tax liability for Herald for each of those years. The correctness of those depreciation deductions is the subject of this action.

During the period beginning February 12, 1976 and ending November 5, 1976, Herald purchased all the outstanding stock of Booth Newspapers, Inc. ("Booth"). Stip. para. e. Booth was a Michigan corporation with its principal place of business in Ann Arbor, Michigan. Booth published the following daily and Sunday paid-circulation newspapers in eight Michigan communities: Ann Arbor News, Bay City Times, Flint Journal, Grand Rapids Press, Jackson Citizen Patriot, Kalamazoo Gazette, Muskegon Chronicle, and Saginaw News. Stip. para. c. On the May 31, 1977 acquisition date, these newspapers had a total of approximately 460,000 subscribers. Stip. para. j. In addition to publishing the Booth newspapers, Booth owned all the stock of the Parade Publications, Inc. ("Parade"), which published a nationally-distributed Sunday newspaper supplement called *Parade*. Stip. para. c.

Prior to Herald's purchase of Booth, Booth's stock was publicly traded. Herald purchased two blocks of Booth stock through private sales, and later made a tender offer for all of the outstanding stock.

Herald did not obtain an appraisal of any of the Booth assets prior to purchasing the Booth stock. Generally, such appraisals are made subsequent to such a purchase according to Roger J. Grabowski[1]. Before purchasing Booth, however, Herald's officers inquired into the financial and other relevant aspects of Booth's operations and met with Booth's Chief Executive Officer. The decision to purchase the Booth stock and the determination of the price to be paid for that stock were influenced by the fact that the Booth newspapers were paid-circulation newspapers and by the number of subscribers to those newspapers.

On May 31, 1977, Booth was liquidated into Herald by merger in a transaction governed by sections 332 and 334(b)(2) of the Internal Revenue Code of 1954, as amended (the "Code"). Stip. para. c. Subsequently, on June 30, 1987, Herald was

---

1. Mr. Grabowski is an expert in valuation theory and methodology, in particular in the valuation of intangible assets in ongoing businesses, in the media industry among others, and in the valuation of customer base assets.

merged into Morning Ledger, making the operations of Herald and Booth unincorporated divisions of Morning Ledger. Stip. para. b.

As a consequence of the liquidation of Booth into Herald, pursuant to the rules set forth at section 1.334–1(c)(4)(vi)(b) of the Treasury regulations, Herald's adjusted tax basis in the Booth stock had to be allocated among the assets of Booth in proportion to their respective fair market values as of May 31, 1977. In filing its tax returns for calendar and taxable years 1977 through 1980, Herald claimed depreciation deductions with respect to the paid subscribers of the Booth newspapers. These deductions were calculated by reference to Herald's adjusted basis in the paid subscribers derived from the application of the foregoing rules. The Service disallowed those deductions. Herald paid the additional taxes and interest determined by the Service to be due. Stip. para. d.

Morning Ledger, as successor to Herald, filed a timely claim for refund of taxes and interest previously paid for taxable years 1977 through 1980. Stip. para. m. Pursuant to section 6532(a) of the Code, the Service had six months in which to act upon the claim before suit could be brought. The six-month period expired without action by the Service. Stip. para. n. Morning Ledger timely filed this action to recover federal income taxes and interest which it alleged were erroneously assessed and collected by the Service for those taxable years. Stip. para. o.

The total fair market value of the assets acquired by Herald in the liquidation of Booth was $313,997,154. Herald's total adjusted tax basis in these assets was $328,173,154. Stip. para. f. The assets were of three types: (1) cash, cash equivalents, and other financial assets including securities, accounts and notes receivable, and deferred charges and deposits; (2) tangible and intangible assets of the Booth newspapers publishing operations including land, land improvements, buildings, equipment, furniture, fixtures, vehicles, paid subscribers, computer software, going concern value, and goodwill; and (3) the stock of Parade. Stip. para. g.

On May 31, 1977, the fair market values and adjusted tax bases of certain of the assets acquired by Herald in the liquidation of Booth were as follows:

| Assets | Fair Market Value | Adjusted Tax Basis |
|---|---|---|
| Cash and Equivalents | $ 15,617,042 | $ 15,617,042 |
| Securities | 37,249,852 | 39,134,189 |
| Accounts and Notes Receivable | 15,046,899 | 15,046,899 |
| Master Repurchase Agreements | 3,100,000 | 3,100,000 |
| Deferred Charges and Deposits | 323,944 | 340,331 |
| Inventories | 3,435,627 | 3,609,423 |
| Land | 4,658,885 | 4,894,561 |
| Land Improvements | 1,721,959 | 1,809,067 |
| Buildings and Improvements | 21,350,237 | 22,430,269 |
| Production Equipment | 17,109,130 | 17,974,620 |
| Computer Hardware | 1,300,435 | 1,366,219 |
| Furniture and Fixtures | 880,775 | 925,330 |
| Office Equipment | 731,195 | 768,184 |
| Autos and Trucks | 234,489 | 246,351 |
| Computer Software | 1,658,000 | 1,741,872 |
| Stock of Parade | 100,000,000 | 105,058,644 |

Stip. para. h.

The parties have agreed that on May 31, 1977, the total fair market value of the

remaining three intangible assets, i.e., the paid subscribers, the going concern value and goodwill of the papers, was $89,578,685 and the total adjusted tax basis to be allocated pro rata to those assets, pursuant to section 1.334–1(c)(4)(vi)(b) of the Treasury regulations, was $94,110,152, although the government contests that the paid subscribers were assets separate and apart from goodwill. Stip. para. i.

The parties have stipulated that the value of the going concern and goodwill of Booth newspapers will be determined using the residual method, Stip. para. i., the method of valuation generally utilized by the Service and valuation experts to value such assets, according to Larry D. Berkey.[2] Consequently, this court need not determine, based upon direct evidence, the value of goodwill and going concern. The aggregate fair market value of the going concern and goodwill of the Booth newspapers is the difference between $89,578,685 and the fair market value of the paid subscribers of the Booth newspapers, as determined by this Court, assuming that this Court finds that the paid subscribers are assets separate and apart from goodwill. The adjusted tax basis of the paid subscribers of the Booth newspapers is the same proportion of $94,110,152 as the fair market value of the paid subscribers is of $89,578,685. Stip. para. i. The aggregate adjusted tax basis of the going concern and goodwill of the Booth newspapers is the difference between $94,110,152 and the adjusted tax basis of the paid subscribers of the Booth newspapers. Stip. para. i.

All of the foregoing facts are admitted and undisputed. As to the remaining facts in dispute, the court makes the following specific findings:

Advertising provides approximately eighty percent of most newspapers'·revenues, including the Booth newspapers. In order to earn advertising revenue, newspapers are required to produce a newspaper that contains news, entertainment and advertising that is interesting to the readers, according to Dr. Christine D. Urban.[3] Some newspapers generate subscription revenue; others do not.

There are basically two types of newspapers, those with a paid circulation, where the newspapers are sold to the readers, and those which are known as free-distribution newspapers, which are provided to the readers without any charge. Within both categories, there are daily newspapers and newspapers published on a less frequent basis, such as weekly, although free daily newspapers are very rare. Included in the two types of newspapers are shoppers, mailers, weeklies, dailies, business journals, nationals, trade papers, etc., which vary in content, size, format and distribution. The principal difference between the two kinds of newspapers is the fact that paid-circulation newspapers have circulation revenues. Paid circulation can be either on a subscription basis or on a single copy basis, such as at newsstands or through coin boxes. In the case of the Booth newspapers, approximately 20 percent of their total revenues come from circulation revenue, as was the case in 1977. In 1977, approximately 85 percent of the circulation revenue was from subscribers; the balance came from single copy sales. Sales to subscribers were, and are, important to the Booth newspapers because subscriber income is regular and predictable.

On May 31, 1977, the paid subscribers of the Booth newspapers consisted of approximately 460,000 particular customers who had requested that one of the Booth newspapers be delivered to a specific address on a regular basis in return for payment of the subscription price. The number of paid subscribers of each of the Booth newspapers was as follows:

| Newspaper | Daily Subscribers | Sunday Subscribers |
|---|---|---|
| Ann Arbor | 37,743 | 37,122 |

---

2. Mr. Berkey also is an expert in valuation theory and methodology, in particular in the areas of the valuation of intangible assets in ongoing businesses, in the media industry among others, and in the valuation of customer base assets.

3. Dr. Urban is an expert in the newspaper industry, including, in particular, consumer behavior, market trends, and operational matters, such as strategic planning, financial forecasting, circulation strategy, advertising strategy, and news and editorial content and redesign.

| Newspaper | Daily Subscribers | Sunday Subscribers |
|---|---|---|
| Bay City | 37,337 | 36,255 |
| Flint | 91,366 | 91,155 |
| Grand Rapids | 120,011 | 106,859 |
| Jackson | 35,711 | 35,632 |
| Kalamazoo | 51,481 | 52,960 |
| Muskegon | 41,203 | 40,609 |
| Saginaw | 49,327 | 48,942 |

Stip. para. j. The name and address of each paid subscriber was retained by Booth or on its behalf by persons responsible for delivery of the papers. Stip. para. j.

The parties have agreed that, if the Court determines that the paid subscribers constitute assets which were separate and apart from goodwill and which can be valued separate and apart from goodwill, and if the Court determines that the paid subscribers had useful lives which can be estimated with reasonable accuracy, then the paid subscribers of the Booth newspapers can be depreciated on a straight-line basis over the following useful lives:

| Newspaper | Useful Lives of Daily Subscribers | Useful Lives of Sunday Subscribers |
|---|---|---|
| Ann Arbor | 14.7 | 14.7 |
| Bay City | 22.2 | 23.4 |
| Flint | 18.3 | 18.5 |
| Grand Rapids | 17.7 | 21.2 |
| Jackson | 17.9 | 18.9 |
| Kalamazoo | 17.0 | 17.6 |
| Muskegon | 18.0 | 16.2 |
| Saginaw | 17.4 | 18.3 |

Stip. para. k.

### A. Limited Life of the Asset

It is undisputed that all the paid subscribers of the Booth newspapers as of May 31, 1977 would, at some point in time, no longer be subscribers. That fact was recognized by those familiar with Booth, by the members of the Newhouse family when they decided that Herald would purchase Booth, and by those familiar with the newspaper industry generally. Subscribers are lost because of death, relocation, lack of reader time or interest, changing lifestyles, and other factors that are beyond the control of the newspapers. Also, subscribers are lost due to dissatisfaction with the product or service and for various other reasons, including competition from other media sources, such as radio, television, magazines and other paid-circulation and/or free-distribution newspapers.

Defendant contends that the number of subscribers of each of the Booth newspapers, both daily and Sunday, increased from 1977 through the present. Even if true, whether or not new subscribers were added after the date of valuation is not relevant to the nature and value of the asset as of May 31, 1977.

The paid subscribers of the Booth newspapers acquired by Herald on May 31, 1977, were not self-regenerating, i.e., there is no automatic replacement for a subscriber who terminates his or her subscription. Although the total number of subscribers may have or has remained relatively constant, the individual subscribers will not and have not remained the same, and those that may or have discontinued their subscriptions can be or have been replaced only through the substantial efforts of the Booth newspapers. Moreover, because subscribers turn over so frequently, newspapers throughout the country must sell many new subscriptions each year just to maintain their total number of subscribers.

The government's contention that such findings are irrelevant is rejected by the court. The relevance of Morning Ledger's evidence regarding the substantial costs and efforts required to replace lost subscribers demonstrates that the subscribers are not self-regenerating assets. The fact that the expenses that are incurred in maintaining an asset are deductible does not mandate a finding that the asset itself is not depreciable. Notwithstanding the time consuming and expensive efforts made to generate new subscribers, the penetration of the Booth newspapers, i.e., the percentage of total households in their markets subscribing to the newspapers, has declined significantly over the last 20 years.

In 1977 and 1978, Statistical Research, Inc. ("SRI") and Professor Gerald J. Glasser[4] conducted a study of the paid subscribers of the Booth newspapers as of

4. Dr. Glasser is an expert in statistics, including statistical theory, statistical methods and their applications, sampling, data analysis and survey research.

May 31, 1977. Report of Statistical Research, Inc., "Report on the Average Remaining Life of Subscriptions to Booth Newspapers". Using the methodology described by Dr. Glasser and utilized in his study, which relied upon widely accepted statistical techniques, the court finds that the remaining useful lives of the paid subscribers of the Booth newspapers as of May 31, 1977, could be estimated with reasonable accuracy.

Defendant contends that what Dr. Glasser presented to the Court was a mortality table of subscribers *at a particular address*, not a mortality table of the total subscriptions, and that he calculated the mortality table using only the data directly collected in the survey and from no other subscription data, not even data that Booth had already collected. Defendant further urges that Dr. Glasser did not ask the relevant question, "For how long have you been (or intend to be) a subscriber to the newspaper?"

However, because of the stipulation reached by the parties, Morning Ledger need not prove either the specific useful lives of the paid subscribers of the Booth newspapers as of May 31, 1977, or that Dr. Glasser has correctly estimated those lives. In light of the stipulation, defendant's argument with regard to Dr. Glasser's estimation of the specific useful lives of the Booth subscribers is wholly irrelevant. Instead, Dr. Glasser's testimony establishes that qualified experts could estimate with reasonable accuracy the remaining useful lives of the paid subscribers of the Booth newspapers as of May 31, 1977.

As to the question asked, Dr. Glasser explained that the same methodology that he utilized, which is generally accepted by statistical experts, could have been utilized in asking a different question, and such a survey would likewise have led to reasonably accurate estimates of the useful lives of the Booth subscribers.

### B. Valuing the Asset

There were three basis valuation approaches that might have been utilized to determine the fair market value of the paid subscribers of the Booth newspapers as of May 31, 1977; the market approach, the cost approach, and the income approach.

Subscribers to an ongoing newspaper are not commonly sold except as part of a sale of the newspaper operation. Accordingly, there was insufficient data available to permit use of the market approach to determine the fair market value of the paid subscribers of the Booth newspapers as of May 31, 1977.

Although it was possible to estimate the direct cost of soliciting additional subscribers to the Booth newspapers, those subscribers if obtained were not and would not have been comparable, in terms of life characteristics or value, to the paid subscribers of the Booth newspapers as of May 31, 1977. Furthermore, complete data as to the total cost of obtaining even such marginal subscribers had never been compiled. The cost of generating such marginal subscribers would not reflect the fair market value of the existing subscribers of the Booth newspapers as of May 31, 1977. Accordingly, the cost approach could not and should not be used to determine the fair market value of the paid subscribers of the Booth newspapers as of May 31, 1977.

In response to the expert opinions submitted by plaintiff, defendants offered experts who were unqualified, valued the wrong asset and utilized inappropriate methodology.[5]

Defendant asserts that the cost approach is the only valid method of determining the value of any asset relating to the subscribers of the Booth Newspapers as of May 31, 1977. The government submitted expert opinion that every household in the Booth markets could have been solicited for a cost of $3,000,000, and that the result would be to reconstruct the exact set of subscribers, and that the actual cost to recreate the set

---

5. Plaintiff has moved to strike the testimony of defendant's experts. Despite the above finding, the court concludes that (there being no jury) no useful purpose would be served in striking such testimony. On appeal, the appellate court will make its own determination as to the qualifications and testimony of defendant's experts.

of subscribers would actually be far less since, conservatively, 40% of all subscribers would have initiated their own subscription.

The cost of obtaining subscribers does not equate with their value to the enterprise. The court finds that the income approach is, in fact, what buyers and sellers would utilize to determine the price at which these assets would change hands. The government's contention totally ignores the substantial efforts and expenses that had been invested over the years in establishing those subscriber relationships.

The income approach is commonly used to value intangible assets of a going business, other than goodwill and going concern value. This approach best reflects the method that buyers and sellers would utilize to determine the price at which such assets would change hands. Plaintiff's experts presented testimony that buyers and sellers would determine the additional value of the Booth newspapers attributable to the existence of the paid subscribers as of May 31, 1977, and, thus, the price to be paid for those subscribers, by calculating the present value of the net revenue stream they would provide over their limited lives, i.e., the subscription revenue less the cost of collecting that revenue. That methodology, they testified, produces the fair market value of the paid subscribers of the Booth newspapers as of May 31, 1977.

Defendant, however, contends that this method does not use a portion of the net income or profit of a business, but rather an entire revenue stream unencumbered or reduced by appropriate costs and expenses, and that the only subtractions from the subscriber revenue stream were the costs associated with delivery and collection.

As such, defendant argues that the income method of valuation as used by plaintiff is unacceptable and the produced values are not persuasive. Defendant contends that there are additional costs which plaintiff never identified or even considered, for instance, an apportioned cost of producing the newspaper, since a sale of a newspaper and the income derived from the sale is not independent of the cost of producing the paper.

During the trial, the court on numerous occasions questioned the propriety of valuing the subject asset without making any adjustments or deductions for production costs, overhead expense, etc. Although the government raises the same questions, it offered no competent evidence to the court upon which the court could base any finding to reduce plaintiff's evidence of valuation. Absent such evidence the court cannot speculate as to what deductions would be appropriate and how they would impact upon the overall valuation. Plaintiff, on the other hand, presented evidence that their experts' methodology was fully in accordance with generally accepted valuation principles, and the validity of their analysis was supported by the detailed expert testimony of Dr. Urban. Furthermore, Mr. Berkey explained that he had tested his conclusions by a second income approach methodology that included allocating the relevant share of all costs, and that exercise confirmed his initial valuation conclusion. Accordingly the court accepts both the methodology and valuations submitted by plaintiff's experts.

### C. Distinguishing Goodwill and Fixing Value

As to whether this is an asset separate and apart from goodwill, "goodwill" is the expectancy that the old customers will resort to the old place. The essence of goodwill is the expectancy of continued patronage, for whatever reason. Goodwill is acquired by the purchase of a going concern where the transfer enables the purchaser to step into the shoes of the seller.

Goodwill, by definition, has an indefinite life and is valued using the residual method. By contrast, the paid subscribers of the Booth newspapers as of May 31, 1977, could be, and were, identified; had limited lives that could be estimated with reasonable accuracy; and could be, and herein have been, valued directly. Moreover, the paid subscribers of the Booth newspapers as of May 31, 1977, were not self-regenerating. Therefore, the paid subscribers of the Booth newspapers as of May 31, 1977,

were assets with values separate and apart from goodwill.

As stated at the outset, paid subscribers are distinct from previous customers who may or may not return, who may buy more or less or nothing at all. They are identifiable; how long they will remain as subscribers can be predicted with reasonable accuracy; and their value can be measured with a fair degree of accuracy. It is these unique characteristics which separates them from general goodwill and permits of a separate valuation.

To ascertain the fair market values of the paid subscribers of the Booth newspapers, Morning Ledger's valuation experts, Messrs. Larry D. Berkey and Roger J. Grabowski, used a widely accepted application of the income approach to valuation. Specifically, they computed the present value of the after-tax subscription revenues to be derived from the paid subscribers, less the cost of collecting those revenues, and added the present value of the tax savings resulting from the depreciation of the paid subscribers. Both Mr. Berkey and Mr. Grabowski utilized this method because they each independently concluded that this method best determined the additional value of the Booth newspapers attributable to the existence of the paid subscribers as of May 31, 1977, and, thus, the fair market value of those subscribers. As part of this determination, they each concluded that the only additional category of revenue which would be found in a paid subscription newspaper as compared to a free-distribution newspaper is the subscription revenue; similarly, the only additional category of costs is the cost of collecting that revenue. Mr. Berkey concluded that the aggregate fair market value of the paid subscribers of the Booth newspapers as of May 31, 1977, was $67,773,000, and Mr. Grabowski con-

cluded that the fair market value was $60,470,000. The difference in these two valuation conclusions is attributable to Mr. Berkey's use of a four percent per annum inflation factor that Mr. Grabowski did not apply in this valuation. Mr. Berkey tested and confirmed his valuation conclusion by application of another income method under which the relevant portion of all revenues and costs, including editorial costs, production costs, and overhead, were allocated in the valuation of the paid subscribers as of May 31, 1977. Under that analysis, which Mr. Berkey explained was somewhat conservative, he concluded that the paid subscribers would be determined to have a value of $61,500,000, which supported his valuation conclusion under the preferred method of analysis.

As previously indicated, although the government contested the methodology utilized by plaintiff's experts, it offered no evidence to challenge the accuracy of the methodology utilized. Having concluded that the subscribers had no separate value, or if they did, that the cost of replacing the subscription list was the only appropriate method of analysis, no evidence was presented which would persuade the court that the opinions rendered by plaintiff's experts were inaccurate or invalid.

Based upon the explanation contained in Mr. Berkey's report of the reason why he utilized a four percent inflation factor, and the fact that the government did not challenge that part of Mr. Berkey's methodology and analysis, this court finds that the aggregate fair market value of the paid subscribers of the Booth newspapers as of May 31, 1977, was $67,773,000. The corresponding adjusted tax basis of those subscribers was $71,201,395. See Stip. para. i. The fair market value and adjusted tax basis for each newspaper was as follows:

| Subscribers | Number of Subscribers | Fair Market Value | Adjusted Tax Basis |
|---|---|---|---|
| Ann Arbor News—Daily | 37,743 | 3,966,000 | 4,166,626 |
| Ann Arbor News—Sunday | 37,122 | 557,000 | 585,177 |
| Bay City Times—Daily | 37,337 | 5,146,000 | 5,406,318 |
| Bay City Times—Sunday | 36,255 | 737,000 | 774,282 |
| Flint Journal—Daily | 91,366 | 14,392,000 | 15,120,040 |
| Flint Journal—Sunday | 91,155 | 1,810,000 | 1,901,561 |

| Subscribers | Number of Subscribers | Fair Market Value | Adjusted Tax Basis |
|---|---|---|---|
| Grand Rapids Press—Daily | 120,011 | 13,250,000 | 13,920,270 |
| Grand Rapids Press—Sunday | 106,859 | 1,761,000 | 1,850,083 |
| Jackson Citizen Patriot—Daily | 35,711 | 4,622,000 | 4,855,811 |
| Jackson Citizen Patriot—Sunday | 35,632 | 688,000 | 722,803 |
| Kalamazoo Gazette—Daily | 51,481 | 6,655,000 | 6,991,653 |
| Kalamazoo Gazette—Sunday | 52,960 | 1,021,000 | 1,072,649 |
| Muskegon Chronicle—Daily | 41,203 | 5,116,000 | 5,374,800 |
| Muskegon Chronicle—Sunday | 40,609 | 651,000 | 683,932 |
| Saginaw News—Daily | 49,327 | 6,446,000 | 6,772,080 |
| Saginaw News—Sunday | 48,942 | 955,000 | 1,003,310 |
| Total | | $ 67,773,000 | $ 71,201,395 |

Stip. para. i.

Morning Ledger is entitled to depreciate the adjusted tax bases of the paid subscribers of the Booth newspapers as of May 31, 1977, as determined by this Court, on a straight-line basis over their stipulated useful lives.

To the extent any conclusion of law is deemed to be a finding of fact, it is to that extent hereby made a finding of fact.

### Conclusions of Law

This court has jurisdiction of this matter pursuant to 28 U.S.C. § 1346(a)(1). Venue is proper pursuant to 28 U.S.C. § 1402(a)(2).

This matter arises under section 167 of the Code, which provides, in part, that a taxpayer shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in its trade or business, or of property held by the taxpayer for the production of income. Also relevant is section 1.167(a)–3 of the Treasury regulations, 26 C.F.R. Sec. 1.167(a)–3 at 649 (1988), which provides in pertinent part:

> If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance.... No allowance will be permitted merely because, in the unsupported opinion of the taxpayer, the intangible asset has a limited useful life. No

deduction for depreciation is allowable with respect to goodwill.

The standard set forth in section 1.167(a)–3 of the Treasury regulations has evolved into a two-pronged test. To depreciate an intangible asset, a taxpayer must demonstrate as a factual matter that the asset has: a limited useful life, the duration of which can be estimated with reasonable accuracy, and an ascertainable value separate and apart from goodwill. *See, e.g., Donrey, Inc. v. United States*, 809 F.2d 534, 537 (8th Cir.1987); *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240, 1250 (5th Cir.1973), *cert. denied*, 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974); *Citizens & Southern Corp. v. Commissioner*, 91 T.C. 463, 479 (1988), *appeal docketed* No. 89–8159 (11th Cir. March 3, 1989); Rev.Rul. 74–456, 1974–2 C.B. 65, 66.

Goodwill is conclusively presumed, per se, not to be depreciable. *Marsh & McLennan v. Commissioner*, 420 F.2d 667, 668 (3rd Cir.1969); *Winn Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 683 n. 8 (5th Cir.1971); *Skilken v. Commissioner*, 420 F.2d 266, 268 (6th Cir.1969); *Houston Chronicle Publishing Co. v. United States*, supra at 1247; *Am. South Bancorporation v. United States*, 681 F.Supp. 698, 712 (N.D.Ala.1988).

As the parties have stipulated, the determination is plainly a factual one to be made, in this instance, by the Court. The parties have stipulated that the determination of whether intangible assets, including customer base assets such as Booth's at-will relationships with the paid subscribers of its newspapers on May 31, 1977, have

limited useful lives is a factual inquiry. *See, e.g., Richard S. Miller & Sons, Inc. v. United States*, 537 F.2d 446, 452, 210 Ct.Cl. 431 (1976). In this regard, the Treasury regulations require only that the useful lives be estimated with "reasonable accuracy." Treas.Reg. § 1.167(a)-3. As the Fifth Circuit explained in *Houston Chronicle:* "Extreme exactitude in ascertaining the duration of an asset is a paradigm that the law does not demand. All that the law and regulations require is reasonable accuracy in forecasting the asset's useful life." 481 F.2d at 1253-54. *See also Burlington Northern, Inc. v. United States*, 676 F.2d 566, 573, 230 Ct.Cl. 102 (1982); *Richard S. Miller & Sons, Inc.*, 537 F.2d at 455; *Citizens & Southern Corp.*, 91 T.C. at 500; *Liquid Paper Corp. v. United States*, 83-1 U.S.T.C. para. 9305 at 86,779, 2 Cl.Ct. 284 (1983); *Business Service Indus., Inc. v. Commissioner of Internal Revenue*, 51 T.C.M. 539, 543 (1986).

The fair market value of an asset is the price at which the asset would change hands between a hypothetical willing buyer and willing seller, neither being under any compulsion to buy or sell, both parties having reasonable knowledge of relevant facts. Rev.Rul. 59-60, 1959-1 C.B. 237.

### Conclusion

Morning Ledger is entitled to depreciate the value of the paid subscribers of the Booth newspapers acquired on May 31, 1977, over their stipulated useful lives, having established that the subscribers have limited useful lives that can be estimated with reasonable accuracy and an ascertainable value separate and apart from goodwill.

To the extent any finding of fact is deemed to be a conclusion of law, it is to that extent hereby made a conclusion of law.

As part of and consistent with these Findings of Fact and Conclusions of Law and any Final Order entered in this matter, the parties are directed to calculate the actual amounts of tax and interest due to Morning Ledger consistent with the Court's findings and opinion.